**In re WHET, INC., Debtor.**

**Bankruptcy No. 80–1542–HL.**

United States Bankruptcy Court,
D. Massachusetts.

March 21, 1983.

Anthony R. Martin-Trigona, pro se.

Jon D. Schneider, Goodwin, Proctor & Hoar, Boston, Mass., for trustee of WHET, Inc.

David Ferrari, trustee.

## MEMORANDUM AND ORDER ON RECUSAL

HAROLD LAVIEN, Bankruptcy Judge.

Before the Court are the recusal motions of Anthony R. Martin-Trigona, a creditor and shareholder of the debtor WHET, Inc.,[1] and Edward Kenneth Suskin, Esquire, on behalf of three creditors[2] of the debtor.

A brief review of this case will put the subject motion in context. Voluntary Chapter 11 petitions for each of two radio station corporations, New Haven Radio, Inc., and WHET, Inc., owned by Mr. Martin-Trigona, and Mr. Martin-Trigona's personal Chapter 11 petition were filed in the Southern District of New York. The WHET, Inc. petition was filed on August 15, 1980. The New Haven Radio, Inc. case and the individual Chapter 11 case were transferred to the District of Connecticut. This debtor's case was transferred to the District of Massachusetts on September 3, 1980. The case was assigned to me through the "blind draw" system. At that time, Mr. Martin-Trigona was in a federal penal institution in Missouri, and the radio station of which he was chief executive officer was experiencing serious financial problems. As a result of a hearing in Boston on September 17, 1980, a trustee was ordered and the United States Trustee appointed David J. Ferrari. The trustee determined that without the infusion of substantial capital, which did not seem then available, reorganization was not possible. The station would have substantially less value without its FCC license and without transmitter towers and both were in jeopardy. Sale of the station was the only appropriate route.[3] After notice and hearings detailed in this Court's Memorandum on Sale and Related Matters, *In re WHET, Inc.,* 12 B.R. 743 (Bkrtcy.D.Mass.1981), the Court on June 30, 1981, authorized the sale of the station.

The first of five recusal motions was filed by Mr. Martin-Trigona on July 23, 1981.[4] With each motion, his language grew more abusive in describing a vast plot against him devised by the "Boston Bankruptcy Ring."[5] In an attempt to help him perceive his situation from a more balanced perspective, I hopefully answered one of his vitupertive motions with a portion of a short, "turn-the-other-cheek-type" prayer.[6]

1. At the outset it should be noted that Mr. Martin-Trigona's standing as either a creditor or shareholder is questionable since he has an individual bankruptcy case in Connecticut, and it is the trustee in that case who is the real party in interest. 11 U.S.C. §§ 541, 704. *In re Goodwin's Discount Furniture, Inc.,* 16 B.R. 885, 887–88 (Bkrtcy.App. 1st Cir.1982).

2. The trustee has objected to the claims of these three creditors. Attorney Suskin, a sometime financial advisor of Mr. Martin-Trigona, also claims the status of creditor as assignee of some of Mr. Martin-Trigona's claims.

3. See transcripts of hearings before me June 19, 1981, at 46–47, and June 30, 1981, at 35–39.

4. This motion was denied on August 3, 1981. The second motion to recuse was filed August 31, 1981, and denied September 9, 1981. The third was filed on September 29, 1981 and denied October 1, 1981. The fourth was filed December 7, 1981 and denied on December 8, 1981. Each of the first three orders denying the motion to recuse was appealed by movant to the Bankruptcy Appellate Panel. Each of the appeals was dismissed on the basis that the denial of a motion to recuse is an interlocutory order and there was not sufficient cause to exercise appellate jurisdiction. See Appeal Nos. 81–9033, 81–9038, and 81–9039.

5. This plot has been described in numerous pleadings, in similar terms. The following description appears in movant's application for Writ of Habeas Corpus, filed December 9, 1982:

"Ferrari, Lavine, Goodwin Proctor & Hoar [counsel to the trustee] and other bankruptcy scum acted, combined and conspired to kidnap Martin-Trigona through the auspices of one Warren White in January, 1981, for the purpose of stealing the debtor and converting these assets for the benefit of the bankruptcy scum ring."

6. September 28, 1982 Order on Debtor's Motion to Vacate and Demand for Service:

" 'Oh Lord,
Guard my tongue from evil and my lips from speaking guile,
And to those who slander me, let me give no heed.' *

This had the opposite of the desired calming effect. Mr. Martin-Trigona's charges and threats expanded beyond pleadings filed with the court to include letters not only to me, but to the Federal Bureau of Investigation, the Internal Revenue Service, the Court of Appeals, my relatives, and perhaps others. The fifth motion to recuse, the motion which is the subject of this memorandum, was filed in open court on January 5, 1983. This was the first recusal motion the movant argued in person.[7] His pro se presentation lasted for over four hours, on January 5, 1983, and by that, I do not mean to suggest that he would not have argued the others had he been free to do so. I am merely pointing out that he was given full reign at a time chosen for his convenience and with a briefing schedule selected and extended at his request so that both I and any reviewing court could be sure that however it turned out, there was a full and complete presentation of any and all grievances.

After careful review of his handwritten recusal motion,[8] oral argument, and subsequent memoranda of law, it appears that the asserted grounds for recusal can be fairly summarized as follows: First, the Court's conduct of the proceedings suggests a conspiracy and an improper bias of the Court in favor of the trustee and his counsel. Second, because the Court is the subject of several lawsuits and investigations initiated by the movant, I cannot possibly be perceived by a reasonable person as unbiased or impartial.

Title 28, § 455 of the United States Code contains the most recent rule promulgated by Congress with regard to disqualification of federal judges, including bankruptcy judges. It reads, in part:

(a) Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

The language of § 455(a) is easier to state than to apply. Possibly, the most troubling part of the language concerns the determination of in whose eyes must the impartiality be open to question, and what is meant by "reasonably." The First Circuit Court of Appeals has provided us some guidance:

The [1974] Amendment to 28 U.S.C. § 455 changed the standard for recusal from a subjective one, which left to the judge "in his opinion" the decision whether it would be improper to sit, 28 U.S.C. § 455 (1970), to the present objective standard requiring disqualification whenever the judge's impartiality "might reasonably be questioned."

. . . .

The proper test, it has been held, is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge

---

"The order was non-adversarial, required no notice but in fact, notice was given to counsel for the movant's personal trustee. *In re O.P.M. Leasing Services, Inc.,* 21 B.R. 983, 985 (D.S.D.N.Y.1981). The sale in fact was consummated and the entire purchase price paid and the order was actually unnecessary. *The motion is denied."*
* From the *Amidah*—An Ancient Jewish Prayer"

**7.** Mr. Martin-Trigona is a law school graduate who passed the Illinois bar but was denied admission. *See In re Anthony R. Martin-Trigona,* 55 Ill.2d 301, 302 N.E.2d 68 (1973). In the hearing of January 5, it was almost fascinating to listen to him make the most outrageous

statements and charges in a well-modulated voice and to see how articulate and even respectful he could be when he found a potentially valid legal or factual point. Some of his more recent pleadings support his claim to be as competent as most lawyers.

**8.** The Motion to Recuse Judge states:
"Debtor and Anthony R. Martin-Trigona, jointly and severally, move Harold Lavine to recuse himself because of his participation in fraud and the theft of the assets of the debtor. "The appearance of justice is destroyed when a judge who is subject to federal investigation forces himself in a case to seek to cover-up his fraud."

himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. § 455, but rather in the mind of the reasonble man. *United States v. Cowden,* 545 F.2d 257, 265 (1st Cir.1976) (citing *Parrish v. Board of Commissioners of Alabama State Bar,* 524 F.2d 98, 103 (5th Cir.1975); Note, *Disqualification of Judges and Justices in the Federal. Courts,* 86 Harv.L.Rev. 736, 746–47 (1973)).

*See also In re United States,* 666 F.2d 690, 694 (1st Cir.1981).

Some courts have resolved the issue of disqualification by determining that *appearances* are most important, regardless of the facts. *See In re Olson,* 20 B.R. 206 (D.Neb.1982), where the district court reversed the bankruptcy court and required recusal because the judge was aware that the debtor had made accusations of improper conduct against him to various government officials. However, the Fifth Circuit case on which *Olson* relied was grounded on more compelling and persuasive facts. *See id.* at 21 (citing *Potashnick v. Port City Const. Co.,* 609 F.2d 1101, 1111 (5th Cir.), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980) (father of trial judge was partner in law firm representing a party in the case, and attorney for the plaintiff also represented judge in unrelated matter; "questionable case" calling for disqualification)). *Olson* is not the view of the First Circuit and may, in fact, be an aberration. Even Chief Justice MacKinnon, a proponent of the "appearance of justice" rule who felt strongly enough about that view to dissent, alone, in the case of *Mitchell v. Sirica,* 502 F.2d 375, 379 (D.C.Cir.1974), limited his application of the rule. He "strongly urged (without success) the application of the 'appearance of justice' rule with respect to extrajudicial source bias [and] refused to go so far as to 'bias developed *during the very trial.'*" *Lazofsky v. Sommerset Bus Co., Inc.,* 389 F.Supp. 1041, 1045 (D.E.D.N.Y. 1975). What Justice MacKinnon said in *Sirica* was:

> We were concerned that disqualifying judges for bias developed *during the very trial* in which disqualification is sought

would cripple the courts, and refused to disqualify the judge. Plainly, if such bias were sufficient, virtually every judge in every case would be disqualified and the courts abruptly would cease functioning. *Mitchell v. Sirica, supra,* at 379 (citing *Tynan v. United States,* [D.C.Cir.] 376 F.2d 761, 764, *cert. denied,* 389 U.S. 845 [88 S.Ct. 95, 19 L.Ed.2d 111] (1967))

In its report on the 1974 Amendment the House Judiciary Committee stated:

> While the proposed legislation would remove the "duty to sit" concept of present law, a cautionary note is in order. No judge, of course, has a duty to sit where his impartiality might be reasonably questioned. *However, the new test should not be used by judges to avoid sitting on difficult or controversial cases.*

> At the same time, in assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a reasonable basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, *but they are not entitled to judges of their own choice.* H.R.Rep. No. 93–1453, 93rd Cong., 2nd Sess., *reprinted in* 1974 U.S. Code Cong. & Ad.News 6351, 6355 (emphasis added). *See also* Judicial Canon 3C and Canon 2 of the ABA Code of Judicial Conduct.

The question, therefore, to be addressed when considering recusal under § 455 is whether "disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality." *Potashnick, supra,* at 1111; *see also United States v. Ferguson,* 550 F.Supp. 1256, 1260 (S.D.N.Y.

1982) ("whether a reasonable member of the public at large, aware of all the facts, might fairly question the Court's impartiality").

While 28 U.S.C. § 144 is not directly pertinent since it expressly does not apply to bankruptcy judges,[9] it is so closely related that some of its requirements are still relevant:

(3) The statutory requirement that the affidavit must state the facts and reasons showing disqualification has been construed to require that it set forth the identifying facts of times, places, persons, occasions and circumstances with the particularity that would be reasonably expected in a bill of particulars.... It must set out objective facts, as general or conclusory allegations will not support disqualification....

(4) The facts in the affidavit must show that the bias or prejudice is personal, as opposed to judicial, in nature; that is, an attitude of extra-judicial origin.

United States v. Zagari, 419 F.Supp. 494, 501 (N.D.Cal.1976) (citations omitted).

It is now necessary to examine the record as it relates to the present motions to recuse. I focus first on Mr. Martin-Trigona's motion. It is movant's contention that I have extrajudicial involvement in this case; specifically that I, the trustee, counsel to the trustee, and others, are allies in a theft of the assets of the debtor. I will not address each individual allegation made by the movant in support of his conspiracy theory because, for the most part they are simply conclusory accusations and I have already described my handling of this case in great detail. See In re WHET, Inc., 12 B.R. 743 (Bkrtcy.D.Mass.1981). The allegations emphasized by the movant, however, will be reviewed so that they may be disposed of after a full airing. This review is probably more detailed than necessary but is warranted because of the serious nature of the contentions.

▉ Movant points to several adverse (to him) rulings made by the Court, includ-

ing the denial of motions for forma pauperis status, denial of writs of habeas corpus ad testificandum, the order approving the sale of the radio station, and an order requiring pleadings to conform to Bankruptcy Rule 911. Each of these matters is the subject of appeals initiated by the movant, and at least the first three matters have been previously addressed in the Court's detailed opinion. Id. In any event, rulings perceived as adverse by a litigant do not provide the basis for a recusal motion. "[W]e caution against a district judge disqualifying himself on the basis of an allegation of a perceived history of rulings that a moving party dislikes." Phillips v. Joint Legislative Committee, 637 F.2d 1014, 1021 (5th Cir.1981). Also, the case law is clear that recusal is not a substitute for a substantive appeal. " '[The recusal statute] was never intended to enable a litigant to oust a judge for adverse rulings made, for such rulings are reviewable otherwise ....' " In re International Business Machines Corp. 618 F.2d 923, 929 (2nd Cir.1980) (quoting Ex parte American Steel Barrel Co., 230 U.S. 35, 44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913)). Further, the bias which would require recusal must be extrajudicial. The judge must necessarily form opinions based on what he observes during the course of a case.

He must ... shrewdly observe the strategems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility. In re International Business Machines Corp., supra, at 930.

▉ It must be emphasized that the key event in the WHET, Inc. case was the June 30, 1981 order approving the sale of the radio station. That order was appealed by Mr. Martin-Trigona on July 30, 1981. The Bankruptcy Appellate Panel dismissed the appeal on May 14, 1982 for lack of diligent prosecution. See Appeal No. 81–

---

**9.** See, e.g., In re Pritchard & Baird, Inc., 16 B.R.   16, 18 (Bkrtcy.D.N.J.1981).

9030. It appears from the docket that the dismissal order has been appealed to the First Circuit. On August 12, 1981, Mr. Martin-Trigona appealed the August 3, 1981 order denying his motion to vacate the order approving the sale. On March 26, 1982, the Bankruptcy Appellate Panel granted the trustee's motion to dismiss the appeal. *See* Appeal No. 81–9033. The dismissal was appealed to the First Circuit. On October 16, 1981, Mr. Martin-Trigona appealed the October 9, 1981 denial of his renewed motion to vacate order of sale (and other relief). On December 13, 1982, that appeal was dismissed because appellant failed to comply with the filing requirements of Rule 12.[10] *See* Appeal No. 81–9050. That dismissal has been appealed to the First Circuit. The sale order was also appealed by Affiliated International Investors, Inc., one of the creditors represented by Attorney Edward Kenneth Suskin. The Bankruptcy Appellate Panel dismissed that appeal on May 6, 1982 for appellant's failure to file a brief. See Appeal No. 81–9028. That order is the subject of an appeal to the First Circuit. Neither appellant, Martin-Trigona nor Affiliated International Investors, Inc., has permitted the Bankruptcy Appellate Panel to consider the sale order on the merits. (It might also be noted that both appellants filed motions to recuse the Bankruptcy Appellate Panel, which motions were denied.)

The sale has been consummated. The consideration has been paid in full. The FCC license has been transferred and the new owners are operating the station. For discussions of the extensive advertising, heated bidding, and the analysis of the prevailing bid and appraisals, see the transcripts of June 19 and June 30, 1981 hearings and the Court's analysis in its Memorandum on Sale. To the extent that any appeals are still pending, the First Circuit

Court of Appeals may affect the sale in some way but the trial court's part is substantially over,[11] whether or not recusal takes place or the case is transferred. Yet, it is clear from Mr. Martin-Trigona's statements that he wants the case to go back to square one. He overlooks the fact that if the order approving the sale of the property was not stayed pending appeal and if the sale was made to a good faith purchaser, the appellate court cannot, under Rule of Bankruptcy Procedure 805, rescind the sale.[12] Movant has suggested in a recent pleading that the Fifth Circuit opinion *In re Braniff Airways, Inc.,* 700 F.2d 935 (5 Cir. 1983) is authority for his position that the June 30, 1981 order approving the sale of the radio station was error. *Braniff* is not contra authority. The court noted the question of whether 11 U.S.C. § 363(b) authorizes a sale of all of a debtor's assets and cited *In re WHET, Inc., supra,* for the proposition that courts have so construed § 363(b). Immediately thereafter the Fifth Circuit stated: "We need not express an opinion on this controversy because we are convinced that the [subject] transaction is much more than the 'use, sale or lease' of *Braniff's* property authorized by § 363(b)." The court concluded that the Braniff proposal was actually in the nature of a fully integrated plan of reorganization and not just a sale.

Related to the Mr. Martin-Trigona's general theory that the Court and the trustee are aligned in a theft of the debtor's assets is his allegation that the Court permitted the trustee to enter into a secret agreement with the debtor's landlord, Charles River Broadcasting. I am satisfied from review of the record (including review of the notice of sale, the content of Attorney Suskin's objection to the sale filed June 15, 1981, the July 1, 1981 Memorandum on Sale and Re-

---

10. First Circuit Rules Governing Appeals to Appellate Panels (March 1, 1980).

11. [A]fter a notice of appeal is timely filed, the district court has no power to grant the appellant's motion to dismiss the action without prejudice, or to allow the filing of amended or supplemental pleadings or otherwise reex-

amine the order from which an appeal is pending.
9 *Moore's Federal Practice* ¶ 203.11, at 3–34 to 3–47 (2nd ed. 1982) (footnotes omitted).

12. *In re Citizens Mortgage Investment Trust,* 25 B.R. 1005 (Bkrtcy.D.Mass.1982); see particularly *id* at 1008 and cases cited.

lated Matters, and the transcripts of hearings which took place June 19, 1981 and June 30, 1981), that the Court and parties in interest were informed of the payments to be made to Charles River Broadcasting in order that the station and its transmitting facilities might be sold as a unit and thereby maximize the sale price. I am also satisfied that there was ample opportunity to object as, in fact, Attorney Suskin did on June 15, 1981. The payments to Charles River were approved by the Court in its order authorizing the sale. Any remaining questions with regard to Charles River Broadcasting and claims of its officers await hearing, and, of course, the Court will hear relevant evidence and arguments including any that Mr. Martin-Trigona cares to present.

Another allegation relating to the movant's conspiracy theory is that the trustee's failure to file financial reports at the intervals required by the Office of the United States Trustee, and the trustee's failure to make available to the movant certain financial records requested by him, permit an adverse inference to be drawn that I, or my relatives, or others with whom I am allegedly associated, have an interest in the funds or the situs of the funds. On this matter, it can simply be pointed out that I have addressed the manner of the trustee's reporting in the Memorandum on Sale, *In re WHET, Inc., supra,* at 748. Further, monitoring compliance with the requirements of the United States Trustee's Office is exclusively the responsibility of that office. When a party in interest properly brings before the Court a problem relating to the availability of the debtor's records or the trustee's accounting, appropriate orders are entered. The original order authorizing the sale made reference to the trustee's performance and the requirements refiling reports. On December 27, 1982, I ordered, sua sponte, the trustee to amend and supplement the Disclosure Statement to in-

clude "a full and complete analysis of funds received by the trustee during his entire administration and all disbursements.... There also should be some analysis of the trustee's stewardship including a profit and loss summary." (This order should not be read to imply there were no reports in the files, but rather that the information in the Disclosure Statement was inadequate.) On January 24, 1983, in response to the movant's motion to compel discovery, I promptly entered an order to compel discovery. The trustee's alleged failure to comply will be taken up at the hearing on the movant's Motion for Order to Show Cause why trustee's counsel should not be held in contempt. A hearing on this matter would already have been held but for Mr. Martin-Trigona's several requests for continuances that have prevented ruling on this recusal motion. (The Court agreed to refrain from ruling on any adversarial matters until disposal of the recusal motion.)

Movant avers that his interests were not represented at the hearings on the sale on June 19 and June 30, 1981 because of a conflict of interest of Attorney Gerald T. Weiner who was present at those hearings allegedly at the request of Mr. Martin-Trigona.[13] The Court questions the candor of Mr. Martin-Trigona, however, since on July 28, 1981, he filed a petition under Chapter 11 for WHET, Inc. in Connecticut and thereafter filed a motion with the Connecticut Bankruptcy Court to appoint Attorney Weiner's law firm to represent WHET, Inc. and the two related Chapter 11 cases in Connecticut.[14]

The final assertion made by the movant in connection with the alleged conspiracy is that the Court engaged in ex parte contacts with functionaries in this case. Movant has stated by way of affidavit that Attorney Weiner, who was present at the June 19 and June 30, 1981 hearings on the proposed sale of the radio station, told him that he

---

**13.** Atty. Weiner's status in the case in connection with his representation of Mr. Martin-Trigona is discussed in considerable detail in the Memorandum on Sale, *In re WHET, Inc., supra,* at 746–49. See also Transcripts of Hearings,

June 19, 1981 at 4–8; June 23, 1981 at 3–16; June 30, 1981 at 3–15.

**14.** *In re WHET, Inc.,* 14 B.R. 695 (Bkrtcy.D. Conn.1981).

(Weiner) had seen me and lawyers for the trustee leaving chambers together. Putting to one side the hearsay nature of the statement, the movant in the same affidavit accused Weiner of fraudulent behavior and of "sabotaging my representation in Boston." [15] Our local rules and every courts' rules do permit, in specified circumstances, orders to be entered ex parte.[16] In fact, orderly judicial procedure may require the Court to rule on numerous ex parte nonadversarial matters. The movant seems to be saying that anything ex parte is extrajudicial and, therefore, prohibited. Movant "ignores the fact that related judicial functions [can] extend beyond the courtroom door. Further, *ex parte* conversations occasioned by the exercise of related judicial functions do not stem from an extrajudicial source." *In re Parr,* 13 B.R. 1010, 1018 (D.E.D.N.Y.1981) (citation omitted). The *Parr* court pointed out that to argue that ex parte conversations related to such functions are extrajudicial "would by definition deem all *ex parte* communication as extrajudicial, and thus pave the way for rampant judge-shopping". *Id.* It is ironic that movant should allege improper ex parte contacts when, next to my approach toward fee allowances, the policy which the bar most often seeks to change is my refusal to see counsel in chambers and my locked (literally) door.

In connection with the ex parte contacts allegation, movant has previously pointed to my reference to "oral reports" of the trustee. He seems to assume that if a report is oral, it must be ex parte. In fact, the reports referred to were made during the course of duly noticed hearings at which a court stenographer was present. Obviously, hearings are transcribed only if a party orders a transcript. My own cursory review of transcripts in the files located three such reports plainly on record. See Transcripts of Hearings on January 22, 1981, June 19, 1981 and June 30, 1981.

One more accusation related to the allegation of my purported alliance with the trustee is the matter of my requesting the trustee, or counsel to the trustee, to notice certain matters for hearings. I do not see how this can be viewed as a sign of favoritism. The Court frequently requests the proponent in a matter to notice interested parties, and to file a certificate of notice, because the proponent often knows better than the clerk's office who the interested parties are, or the proponent should bear the expense of extensive noticing, or can do the noticing more quickly (if time is a factor), or even because the clerk's office has a limited staff. The rules explicitly provide for the procedure.[17]

I am not ignoring movant's major allegation, that I and/or my immediate family, other relatives, former law firm, or other professional associates are either directly enjoying proceeds of the sale of the radio station, or indirectly doing so by having a disqualifying financial interest in the situs of the funds, or that I have knowingly assisted the trustee, counsel to the trustee, or some other functionary in somehow personally benefitting from these funds. I have already described the approach I have taken towards the trustee's accounting and the availability of the debtor's records. Beyond that what the movant has provided amounts to no more than conclusory accusations. Allegations of conspiracy must be supported by material facts, not merely conclusory statements. *Slotnick v. Garfinkle,* 632 F.2d 163, 165–66 (1st Cir.1980). The courts require more than "mere surmise and conjecture." *United States v. Cepeda Penes,* 577 F.2d 754, 758 (1st Cir. 1978). "A trial judge must hear cases unless some reasonable factual basis to doubt the impartiality or fairness of the tribunal is shown by some kind of probative evidence." *Blizard v. Frechette,* 601 F.2d 1217, 1221 (1st Cir.1979) (citation omitted). *See also In re Parr Meadows Racing Association,* 5 B.R. 564, 566 (Bkrtcy.E.D.N.Y.1980).

---

**15.** In the same paragraph of the affidavit, movant stated that "Mr. Weiner is a defendant in a law suit pending in the District of Columbia."

**16.** Local Interim Bankruptcy Rule 2002A(b)

**17.** See Local Interim Bankruptcy Rule 2002(J).

The First Circuit has more recently addressed the requisite factual basis in *In re United States,* 666 F.2d 690 (1 Cir.1981). In addressing the standard of whether impartiality might be reasonably questioned, the First Circuit "deem[ed] it of first importance to recognize at the outset the twin—and sometimes competing—policies that bear on the application of this standard." *Id.* at 694. Not only must courts objectively appear to be free from bias or prejudice, but the following sometimes-overlooked policy should also be applied:

> [A] judge once having drawn a case should not recuse himself on a unsupported, irrational or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges. Because there exists this second policy, our inquiry cannot stop with the questions: have a number of people thought or said that a judge should not preside over a given case? has the judge's failure to recuse himself been a subject of unfavorable comment in the media? or, would the judge have avoided controversy and the need for appellate review if he had stepped aside? Instead, we must conduct our review in accordance with ground rules designed to determine when the fear of partiality is real and strong enough to require disqualification. *Id.,* at 694–95.

These ground rules are that a judge must ignore rumors, innuendos and erroneous information when considering whether or not to disqualify himself and instead consider whether a charge of partiality is supported on a factual basis. *Id.* at 695. The First Circuit observed that "disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality." *Id.* Movant in his memoranda substitutes "adverse inferences" for facts, and such baseless accusations and unsupportable allegations do not rise to the level of probative evidence.

The second major theory for recusal which the movant argued is that because he has filed lawsuits against me, and others, and has requested certain federal agencies to investigate me, a reasonable person would not view me as impartial. My review of the papers filed in this case, or otherwise brought to my attention by formal process, shows the following. Mr. Martin-Trigona first purportedly brought suit against me in the Western District of Missouri in June of 1981. Movant has now filed a complaint pro se in the Southern District of New York against myself, the other three bankruptcy judges in this district, the United States Trustee, the trustee, the attorney for the trustee, as well as twelve members of the attorney's law firm, alleging violations of the federal anti-racketeering statute.

The third, and most recent, lawsuit [18] brought against me names both my former (over ten years ago) law firm and a cousin with whom I have had no professional or social contact for fifteen years. Additionally, attached as exhibits to movant's Request for Continuance filed December 21, 1982, was a copy of a letter dated December 17, 1982 addressed to the District Director, Internal Revenue Service, Boston, captioned "Re: Complaint Against Harold Lavien and Request for Informer's Payment." Also attached as an exhibit was a copy of a letter to the Criminal Division, United States Attorney's Office, Boston, dated December 18, 1982, and captioned "Re: Fraud and theft in bankruptcy court." Also in the case file is a copy of a letter addressed to the judges of the First Circuit Court of Appeals dated December 8, 1982 and filed December 21, 1982, captioned "Emergency Request for Investigation by the Circuit." A second "supplemental" letter to the judges of the First Circuit, dated December 18, 1982, was also filed on December 21, 1982. On February 11, 1983, a copy of a claim movant

---

**18.** I am uncertain as to the status of this suit. The summons is unsigned and not under any court's signature or seal. The Administrative Office of the United States Courts informed me that its check with the clerk's office showed no complaint had been filed.

apparently filed against me and William Tucker, the United States Trustee for the District of Massachusetts, under the Federal Tort Claim Act was filed as an exhibit to his Motion to Take Judicial/Official Notice.[19] The most recent item of this nature accompanies movant's Supplemental Memorandum of Law in Support of Motion to Recuse Judge, filed March 3, 1983. It is a copy of a letter dated February 28, 1983, addressed to the Foreman and Grand Jury for the District of Connecticut requesting that they "open an independent investigation into fraud and criminal activity in the bankruptcy court system in Connecticut and ... related aspects pending in Boston." Mr. Martin-Trigona said that he requested the Chief Judge to permit him to contact the Grand Jury directly, because the United States Attorney "is a friend of the person committing the illegal acts." Also accompanying the Supplemental Memorandum is movant's affidavit that he testified before the Grand Jury on February 28, 1983 concerning the alleged bankruptcy fraud by me and trustee's counsel. The affidavit stated: "Because of the conflict issues, the Grand Jury proceeding has apparently been adjourned (at my request) for a period of time .... The Court is going to consider whether a special prosecutor or other official from the Department of Justice should be called to handle the cases because of possible conflicts arising in Connecticut."

Movant concludes in his affidavit that I and trustee's counsel "are subjects of an active and ongoing investigation." I must disagree. All movant has shown, if copies of letters are accepted as evidence that they were in fact sent, is his proclivity to engage in harassing tactics. Simply incorporating assertions of a conclusory nature in formal complaints, in letters to federal agencies or appellate judges, or in a speech or letter to a Grand Jury does not make them more than assertions of a conclusory nature. The Seventh Circuit, where Mr. Martin-Trigona has been an active litigant, has defined the problem:

> The tendency of this witness [Martin-Trigona] to exaggerate, to believe himself the victim of conspiracies where none exist, and to suspect without any reasonable basis that others are persecuting him is evident from many of his filings in this record. *Martin-Trigona v. Gouletas,* 634 F.2d 354, 362 (7th Cir.1980) (per curiam).

Issues of bias and self-interest, to be disqualifying, cannot be unilaterally created by the moving party. "A judge is not disqualified merely because a litigant sues or threatens to sue him." *United States v. Grismore,* 564 F.2d 929, 933 (10th Cir.1977).

Movant's harassment tactics range from the childish[20] to the outrageous. For an example of the extremes to which movant will go in an attempt to intimidate and thereby perhaps achieve his objectives, one need only read the December 9, 1982 opinion of Judge Edward Weinfeld in the case of *Martin-Trigona v. Brooks and Holtzman,* 551 F.Supp. 1378 (S.D.N.Y.1982). In order for counsel for the trustee in Connecticut to

---

**19.** Item 11 on the claim, captioned "Description of Accident", contains the following:

In 1980, I was kidnapped, in my absence a bankruptcy ring composed of Harold Lavien, William Tucker and other operators, seized and stole my property, and parcelled it out to their friends unlawfully. Their agents also had me beaten and tortured in county jails, and dragged in chains around the country to prevent me from going to the court to protect my property. The defendants/federal agents are liable for the acts of their coconspirators.

**20.** An example is his deliberate misspelling and mispronouncing of my name:

MR. MARTIN–TRIGONA: Mr. Lavine [La vēēn'] if I may be heard in response to your statement?

THE COURT: You know, the name is Lavien [Lā'vē en] and you have spelled it incorrectly on several of the pleadings and I really would appreciate it if you would pronounce it correctly.

MR. MARTIN–TRIGONA: Well, I am pronouncing it correctly. I don't use Yankee pretensions. And I have many friends who have the same name and they spell it the same way and they pronounce it the same way and I don't see why I'm going to pronounce it your way just because you may have some Yankee pretensions because you—Transcript of Hearing January 5, 1983, at 7.

appear in New York to oppose Mr. Martin-Trigona's motion to revoke the transfer, a local attorney was needed to move for oral admission *pro hac vice,* a routine courtesy motion. Mr. Martin-Trigona, first by letter, threatened the attorney and later sued him for $600,000, wrote to the Disciplinary Committee of the Supreme Court of the State of New York charging the attorney with unethical conduct, and served a lis pendens lien on all of the attorney's assets in New York. Judge Weinfeld not only ultimately dismissed the suit but also enjoined Martin-Trigona from instituting any other action or proceeding against the attorney based on the motion to admit the trustee's counsel. Of particular note is the following language from Judge Weinfeld's opinion.

> The Court takes judicial notice that Martin-Trigona has over the years filed a substantial number of lawsuits of a vexatious, frivolous and scandalous nature. He has been a persistent and calculating litigator. There is a long trail of such actions commenced by him against federal and state judges, bar examiners, public officials, public agencies, lawyers and individuals who in one way or another had any relationship, directly or indirectly, to any matter concerning him. *Id.* at 1384.

In a real sense, Mr. Martin-Trigona is engaged in bribery by intimidation. "So if you're innocent, what do you need this kind of trouble for?" Transcript of Hearing, January 5, 1983, at 64. Movant fairly aptly characterized his approach when he termed it a "crusade." [21] From the very beginning, Mr. Martin-Trigona fought the transfers, from the Southern District of New York, of his personal bankruptcy case and the New Haven Radio, Inc. case to Connecticut, and the transfer of this case to Massachusetts.

His effort to revoke the original transfer orders is still an on-going matter.[22] The crucial point that Mr. Martin-Trigona does not seem to perceive is that recusal or transfer is not the route back to square one. The station has been sold for a fair price, the license has been transferred, and the new owners have been operating the station since approximately July of 1982. Since that time, the trustee's only function has been to preserve the proceeds,[23] account for his stewardship which he was about to do through his amended Disclosure Statement, have the Court hear objections to about twelve claims, and distribute the proceeds. All of these matters were in the process of being attended to but have been delayed pending determination of the recusal motion. Even if the original change of venue from New York were error that would not affect this Court's *jurisdiction* or, in and of itself, void any of this Court's actions.

It may be that Mr. Martin-Trigona, recognizing his legal and factual problem, is attempting by his wild accusations of venal conduct on the part of all the lawyers, trustees, and bankruptcy judges involved in the administration of the estates in both Massachusetts and Connecticut, in the words of former Justice Jackson, to pound loudly on the table in the hope that if he becomes enough of a problem, that by either intimidation or weariness, he may accomplish some part of his purpose. Since he is already in bankruptcy, what does he have to lose? The result is that the accusations increase, the motions, pleadings, complaints and suits multiply, courts and lawyers are buried in mountains of time-consuming paper. If there is one truth, it is that the estate will be bled white by the costs and legal fees engendered by his "crusade."

---

**21.** "In front of you, we have a crusade. And I will never—I'll be back next week with a motion to recuse—I will never let you forget the wrongs that you have committed in the name of the law. You will go to bed at nights saying I wish that Martin-Trigona case would go away." Transcript of Hearing, January 5, 1983, at 69.

**22.** No bankruptcy judge in Connecticut or Massachusetts had anything to do with the original

transfer orders entered in the Southern District of New York. However, after movant's attempts to revoke the transfer orders proved unsuccessful, both the Connecticut and Massachusetts bankruptcy judges became the targets of recusal motions and personal lawsuits.

**23.** Since the hearing on the trustee's accounting has been delayed by this motion it is premature to assume any wrongdoing on the part of the trustee.

However, intemperate and baseless personal attacks are not grounds for me to disqualify myself from completing the remaining matters in this case. I believe that any reasonable person aware of all the facts will agree that the record in this case demonstrates that I have acted with impartiality and have exhibited patience and restraint. *See Grismore, supra,* at 933; *see also* Transcript of Hearing, January 5, 1983.

There are affirmative reasons why the motion to recuse should not be granted. The first is the continuing harm to creditors who have already waited two and one-half years. The second is judicial economy. To quote Chief Judge Caffrey: "This matter comes within that class of cases where 'for a new judge to achieve familiarity would require wasteful delay or duplicated effort.'" *Blizard v. Fielding,* 454 F.Supp. 318, 323 (D.Mass.1978), *aff'd,* 601 F.2d 1217 (1st Cir.1979) (citations omitted). The docket in this case runs 28 single pages.[24] There are voluminous files through which a new judge would have to plow. Even Mr. Martin-Trigona recognized the difficulties inherent in the mass of records. In a recent reply to the Court, in which he supplied a Bankruptcy Appellate Panel Order that did not appear on the case docket and that I had not been able to locate, Mr. Martin-Trigona made reference in a footnote to the "jumbled state of the records."[25] Much of the record-keeping difficulty arises from the volume of motions he has filed in this case and from the number of appeals. While the case did not present any conceptually difficult Chapter 11 problems, it has been moving along a very detour-plagued road toward confirmation of a plan and conclusion. "[D]isqualification is not favored in instances where . . . a single judge has acquired by experience, familiarity with a protracted, involved case which could not easily be passed on to a second judge." *City of Cleveland v. Cleveland Electric Illuminating Co.,* 503 F.Supp. 368, 370 (D.N.D. Ohio 1980) (citation omitted).

At this stage, subject to any action taken by the appellate court, the items that await determination, while of importance, are peripheral in light of the fact that the sale of the radio station has been accomplished. They consist of objections to twelve claims including four claims filed by Mr. Martin-Trigona. The latter belong to his personal trustee in the Connecticut case, and they have been reportedly settled, subject to authorization from the District of Connecticut Bankruptcy Court, a matter that may be delayed because of the present effort to consolidate before one judge all of the various Martin-Trigona proceedings in Connecticut. The remaining matters are the approval of a Disclosure Statement, which is in essence a review of the trustee's accounting of his stewardship, and a distribution of the funds. In addition, various motions filed by Mr. Martin-Trigona, contemporaneously with or subsequent to the subject recusal motion, must be addressed. These include a motion to transfer the case, a motion for order to show cause why the trustee's counsel should not be held in contempt, and a motion to dismiss the case for lack of subject matter jurisdiction. These matters have been set for hearing and the Notice of Hearings has been issued on this date.

Finally, courts must be careful that the recusal process is not used as a method of judge-shopping. *See In re Parr, supra,* at 1018. Litigants are entitled to impartial judges, "but they are not entitled to judges of their own choice." § 455, Legislative History, *supra.* Congress has not yet "prescribed that parties should be given one or more peremptory charges with respect to judges." *Lazofsky, supra,* at 1044. Any judicial system worthy of respect and confidence must provide impartial judges who, though not infallible, will do their individual best to determine the facts from the material presented and apply the appropriate law without outside influence, bias or

---

24. A review of the docket shows that approximately 161 pleadings have been filed, 78 orders have been entered, 14 hearings have been conducted, and 18 appeals have been taken.

25. "Response to Request from the Court," filed January 31, 1983.

prejudice, tempered by the knowledge that we are not simple mechanisms but rather complex human beings, endowed with a reasonable share of common sense. I am satisfied that I have been unbiased and impartial in my judgment and will continue to be so. For the past, the record speaks for itself. I would particularly refer to my detailed opinion approving the sale [26] in which many of Mr. Martin-Trigona's contentions are addressed and, most recently, the transcript of the January 5, 1983 hearing and the allowance of numerous motions of Mr. Martin-Trigona.

Of course, it is not pleasant to read or hear in almost every communication from Mr. Martin-Trigona a steady stream of invective, and the repeated accusation that I am in some way enjoying personal financial benefit from the WHET, Inc. case. Movant frequently claims he needs a new judge because no lawyer is willing to appear before me, on movant's behalf, because of the widespread view that I am part of the "Bankruptcy Ring." How does one defend against such a canard other than to rely on a reputation created over the years and to look to the source of the criticism and let the record speak for itself.

Although, neither I nor the Court need the protection of contempt to preserve our integrity,[27] the possibility of criminal contempt has not been completely ruled out. However, it would seem to me that rather than seek punishment and thereby add new court proceedings, multitudinous pleadings, and protracted hearings and appeals, fairness to all creditors and the policy of judicial economy would be best served by recognizing that this case came to me by the "luck of the draw" and that what should be done is to schedule the necessary remaining hearings and bring this case to a close. It is my view that a reasonable person aware of all the facts would have no reason to question my impartiality in this less than perfect world of fallible human beings.

The grounds for recusal must be of a character to seriously impair the Court's impartiality and so clearly obvious and sufficient enough to overcome the presumption of the Court's integrity. *In re Pritchard & Baird, Inc.*, 16 B.R. 16, 19 (Bkrtcy.D.N.J.1981) (citing *Berger v. United States*, 255 U.S. 22, 23 [41 S.Ct. 230, 231, 65 L.Ed. 481] (1921); *Bumpus v. Uniroyal Tire Co.*, 385 F.Supp. 711 (E.D. Pa.1974)).

Movant must show by probative evidence that grounds exist which would permit a reasonable person, knowledgeable of the circumstances, to doubt my impartiality or fairness. *Blizard v. Frechette*, supra, at 1220. This he has failed to do and I abjure that there has been any improper conduct on my part in connection with this case.[28]

26. *In re WHET, Inc.*, 12 B.R. 743.

27. " 'The law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate.' " *In re Little*, 404 U.S. 553, 555, 92 S.Ct. 659, 660, 30 L.Ed.2d 708 (1972) (quoting *Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947)).

28. An additional matter not previously raised by anyone has also been considered by me. On November 16, 1982, my law clerk was hired by the law firm of Goodwin, Proctor & Hoar commencing September, 1983. About that same time, she drafted a simple notice changing the date of a hearing. Since then, she has had nothing to do with this case or any other case in which Goodwin, Proctor & Hoar served as counsel. It should be noted that she did not become my law clerk until September of 1981, two months after the court approved the sale of the radio station. I only have one law clerk and, therefore, I have used a former law clerk of mine, now one of Judge Glennon's clerks. Occasionally, I have also used one of Judge Lawless' law clerks, and a volunteer student clerk. All pleadings are sent to my chambers from the clerk's office in a closed folder, marked "WHET, Inc.", so that my law clerk will not have any contact with the contents. She does not attend any of the hearings nor do we discuss this or any other case in which the law firm is involved. This, I believe, squares with the accepted manner of handling both my clerk's career imperatives and the Court's need to avoid any possibility of undue influence or favoritism. *See Hall v. Small Business Administration*, 695 F.2d 175 (5th Cir.1983); Canon 5, Code of Conduct for Law Clerks, Administrative Manual, 1A *Guide to Judicial Policies and Procedures*, Ch. X, Pt.R., at 6 (12/14/82).

Therefore, I deny Mr. Martin-Trigona's renewed motion for recusal.

The second motion to recuse before me was filed on January 14, 1983 by Attorney Edward Kenneth Suskin on behalf of three creditors, namely, Donna L. Wolske, SLJ Communications, Inc., and Affiliated International Investors, Inc. ˙Mr. Suskin waived hearing and requested a ruling on the written record. Mr. Suskin argued two grounds for recusal. First, that "the court has tolerated repeated ex parte application on the basis of unverified submissions and claims, and improperly imposed upon parties the burden of proceeding in a manner inconsistent with established principles of bankruptcy practice." I will assume Mr. Suskin is referring to the Objection to Claims filed by the trustee on October 29, 1982, which included his clients' claims and the Order to Show Cause re Objection to Claims which was entered on November 1, 1982, in lieu of an ordinary "Notice of Hearing on Objections to Claims". The Bankruptcy Code and Rules are silent as to the form for objections to claims except for the following language under Bankruptcy Rule 306:

> (c) Objection to Allowance. An objection to the allowance of a claim for the purpose of distribution shall be in writing. A copy of the objection and at least 10 days' notice or, if the claim is for taxes, at least 30 days' notice of a hearing thereon shall be mailed or delivered to the claimant. If an objection to a claim is joined with a demand for relief of the kind specified in Rule 701, the proceeding thereby becomes an adversary proceeding.

The Advisory Committee's Note, in relevant part, states the following:

> Subdivision (c) prescribes the manner in which an objection to a claim for the purpose of distribution shall be made and notice of the hearing thereon given to the claimant.... The contested matter initiated by such an objection to a claim is governed by Rule 914, unless a counterclaim by the trustee is joined with the objection to the claim.

In the present case, the Order to Show Cause re Objections to Claims was in writing, was legible, and properly captioned the court case and docket number, gave the basis of the objection, the relief sought, and appropriate notice of hearing date. A trustee's filing of objections to claims is a routine matter. The noticing of a hearing is a clerical, nonadversarial matter. In this case, the so-called Order to Show Cause was handled as a clerical function with a signature stamp.

■ It has long been established that a properly filed proof of claim is prima facie evidence of its validity if there is an objection to the claim. *Whitney v. Dresser,* 200 U.S. 532, 26 S.Ct. 316, 50 L.Ed. 584 (1906). This concept has been formally incorporated into Bankruptcy Rule 301(b) and Interim Rule 3001(b)(4) and appears in the Legislative History to 11 U.S.C. 502(a). The objecting party (the trustee in this case) has the "burden of going forward," i.e., he or she must produce evidence "of a probative force equal to that of the allegations in the creditor's proof of claim." 3 *Collier on Bankruptcy* ¶ 502.01[3] (15th ed. 1982). The burden of proof as opposed to the burden of going forward is always on the claimant. Once the trustee overcomes the prima facie effect given the claim, the burden is on the claimant to prove the validity of the claim by a preponderance of the evidence. While it would have been better practice not to have labeled the notice of the objections as an Order to Show Cause, the Order to Show Cause form in itself does not shift the burden of proof. *Riverview Packing Co. v. Reconstruction Finance Corp.,* 92 F.Supp. 376, 380 (D.N.J.1950); *Chambers v. Blickle Ford Sales, Inc.,* 313 F.2d 252, 256–57 (2nd Cir.1963) (applying Connecticut law). Any error in the Order to Show Cause, I believe, comes within the harmless error rule. Federal Rule of Civil Procedure 61, made applicable to bankruptcy proceedings by Bankruptcy Rule 905, requires "[t]he court at every stage of the proceeding [to] disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." None of the subject claims has been disallowed for the reason that the

claimant failed to file an answer. In fact, at present only one of the fifteen challenged claims, that of Affiliated International Investors, Inc., has been disallowed for any reason.

Mr. Suskin's second argument for recusal is that "[t]he conduct of the Court in these proceedings vis a vis the creditors represented by the undersigned has been such that it appears retaliatory actions are being taken by the court because counsel is vigorously pressing appeals from rulings of the court." The Affiliated International Investors, Inc. claim was denied on September 22, 1981 because the claimant, after due notice, failed to comply with an August 24, 1981 order for a more definite statement,[29] or to appear at the hearing. Trustee's counsel represented to the Court, in the motion for a more definite statement and at the hearing, that the trustee could not find supporting records for the claim. On September 23, 1981, Mr. Suskin filed a motion to vacate the order for a more definite statement or to extend the time for responding. That motion was denied on September 24, 1981, and that order was appealed on October 5, 1981. The appeal was dismissed by the Bankruptcy Appellate Panel on May 6, 1982 because appellant failed to file a brief. *See* Appeal No. 81–9046. The matter is now before the First Circuit Court of Appeals. *See* Appeal No. 82–1599. The trustee's objections to the claims of Donna L. Wolske and SLJ Communications, Inc. have been set for hearing on several occasions and final action has been postponed, at the request of Mr. Suskin or Mr. Martin-Trigona, for various reasons. The objections will again be set for hearing by means of a procedural order entered this date. At that hearing, the burden of going forward and the burden of proof will be as described above. This is consistent with my previous treatment of objections to claims in this case.

I conclude that neither Mr. Suskin nor Mr. Martin-Trigona has provided any rea-sonable basis for finding that my impartiality might reasonably be questioned or that I have a personal bias or prejudice concerning a party in interest. The motions for recusal are denied.

---

29. The August 24, 1981 order was appealed to the Bankruptcy Appellate Panel on September 8, 1981. The Panel dismissed the appeal for lack of appellate jurisdiction on November 9, 1981. *See* Appeal No. 81–9040. The matter is now before the First Circuit Court of Appeals. *See* Appeal No. 82–1599.