# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
March 11, 2019

Lyle W. Cayce
Clerk

No. 17-20770

In the Matter of:  SONYA M. PORRETTO, also known as Sonya Nelson, doing business as Porretto Beach,

> Debtor

ROSEMARIE PORRETTO,

> Appellant

v.

RANDY W. WILLIAMS, Chapter 7 Trustee,

> Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-23

Before STEWART, Chief Judge, and DENNIS and WILLETT, Circuit Judges.
PER CURIAM:[*]

This appeal involves a dispute over the unpaid balance of a secured creditor's claim in a Chapter 7 bankruptcy case.  The creditor, Rosemarie Porretto, appeals from the district court's judgment valuing her claim at

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-20770

$1,019,000, and requests that this court either reverse and render judgment that her claim is worth over $3 million[1] or, alternatively, remand to the bankruptcy court for further proceedings.

## I

Debtor Sonya Porretto is the daughter of Appellant Rosemarie Porretto. Rosemarie owned and operated Porretto Beach, the family's concession and tourism business in Galveston, Texas, with her husband Henry for over fifty years. Rosemarie and Henry sold the property to their daughter Sonya in July 2005 for $4.5 million. In addition to a $250,000 down payment, Sonya executed a promissory note for $4.25 million payable to the order of her parents ("the Note") and secured by a deed of trust to the Porretto Beach property. Under the terms of the Note, Sonya was to make monthly payments of $23,000 to her parents. Henry passed away in March 2007. In February 2008, the Galveston County, Texas, Probate Court issued an order listing the total value of the Note as $2,886,507.[2]

By the end of 2008, Sonya had stopped making payments on the Note. In June 2009, Sonya sent her lawyer a document stating that she owed $1 million on the Note. That same month, Sonya filed for bankruptcy.[3] In August, Sonya filed initial bankruptcy schedules that did not list Rosemarie's secured claim. Soon after, she amended Schedule D, which listed creditors holding secured claims, to represent that Rosemarie's claim against her amounted to

---

[1] Rosemarie states the amount of her claim as either $2,886,507 or $3,022,163 throughout the record. These figures are consistent because the higher figure accounts for the lower figure plus interest and attorney's fees.

[2] In Probate Court in Galveston, Texas, in February 2008, Rosemarie, acting as the independent executor of Henry's estate, signed a sworn "Inventory, Appraisement, and List of Claims" listing the value of Porretto Beach as $2,886,507. The Probate Court subsequently entered an order approving that document.

[3] Sonya filed for Chapter 11 bankruptcy, which was later converted to a Chapter 7 bankruptcy case upon a motion by the Trustee.

No. 17-20770

$1.019 million. She then filed a second amended Schedule D in February 2012, making the same representation. In April 2012, Rosemarie filed a proof of claim with the bankruptcy court, asserting that her secured claim amounted to $3,022,163.[4] The Trustee filed an objection, requesting that the bankruptcy court determine the amount of Rosemarie's claim.

Throughout 2016, the bankruptcy court held several days of hearings at which both Rosemarie and the Trustee testified. At a hearing on November 15, 2016, Rosemarie submitted the Probate Court's order valuing the Note at $2,886,507. The Trustee objected on the ground that, even though the amount listed in the Probate Court order matched that in Rosemarie's proof of claim, he had no basis to determine how the number was calculated. At a hearing on November 29, 2016 the bankruptcy court issued oral findings of fact and conclusions of law. The bankruptcy court later issued written findings of fact and conclusions of law that Rosemarie's claim was allowable in the amount of $1.019 million and not $3,022,163. Finding no clear error, the district court affirmed.

## II

We have jurisdiction to review the final decision of the district court affirming the bankruptcy court's order. *See* 28 U.S.C. § 158(d)(1). "[We] appl[y] the same standard of review to the bankruptcy court decision that the district court applied." *In re Galaz*, 765 F.3d 426, 429 (5th Cir. 2014) (internal citations and quotations omitted). Conclusions of law are reviewed de novo and findings of fact for clear error. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). "A factual finding is not clearly erroneous if it is plausible in the light of the

---

[4] Rosemarie's proof of claim contained three documents: The Note, the deed of trust, and a half-page, single-spaced document entitled "Calculation of Rosemarie Porretto's Claim" that did not contain a payment history.

record read as a whole." *In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005). We will not reverse a bankruptcy court's factual findings unless "on the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *See Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 152 (5th Cir. 2015). A bankruptcy court's credibility determinations are entitled to deference. *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003).

## III

### A

Rosemarie argues that the bankruptcy court erred by relitigating the unpaid balance of the Note and failing to give the Texas Probate Court's order the full faith and credit it was entitled to under the Full Faith and Credit Act and the United States Constitution.[5] *See* 28 U.S.C. § 1738; U.S. CONST. art. IV, § 1. The Act directs this court to give the Probate Court's order the same effect it would have in Texas courts.[6] *See In re Brady, Tex., Mun. Gas Corp.*, 936 F.2d 212, 217 (5th Cir. 1991). Under Texas law, the Probate Court's order "may be given in evidence in any court of [Texas] in any suit by or against the personal representative."[7] TEX. EST. CODE § 309.151. Texas courts treat an estate inventory filed in probate court as prima facie evidence of a property's

---

[5] The Trustee claims that Rosemarie's full-faith-and-credit argument is not properly before this court because Rosemarie raises it for the first time on appeal. Rosemarie's primary argument on appeal to the district court was that the bankruptcy court erred by effectively modifying the Probate Court's order in violation of the *Rooker-Feldman* doctrine. However, this court has acknowledged that the *Rooker-Feldman* doctrine is consistent with the Full Faith and Credit Act, and "the two arguments are not distinct." *See In re Lease Oil Antitrust Litig.* (No. II)*, 200 F.3d 317, 319 n.1, 320 (5th Cir. 2000). Accordingly, Rosemarie's argument is properly before us. But, for reasons described below, neither doctrine nor Act will sustain her argument here.

[6] The Full Faith and Credit Act provides that a State's "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State." 28 U.S.C. § 1738.

[7] Rosemarie was a "personal representative" as the "independent executor" of Henry's estate. *See* TEX. EST. CODE § 22.031.

character, but do not consider it conclusive.[8]  *See McKinley v. McKinley*, 496
S.W.2d 540, 542 (Tex. 1973) (citing *Krueger v. Williams*, 359 S.W.2d 48, 50
(Tex. 1962), *superseded by statute on other grounds as stated in Stauffer v.
Henderson*, 801 S.W.2d 858 (Tex. 1990)).

Rosemarie contends that, "[i]nstead of recognizing that the Probate
Court's Order established the baseline amount owed under the Note as of 2008,
the lower courts essentially treated it as a nullity."  We disagree.  In applying
this court's burden-shifting framework for analyzing a creditor's claim in
bankruptcy proceedings, the bankruptcy court first found that Rosemarie *had*
established a baseline claim in the amount listed in the Probate Court order.
However, the bankruptcy court went on to conclude that Rosemarie could not
meet her ultimate burden of proof under the framework, which provides:

> [A] party correctly filing a proof of claim is deemed to have
> established a prima facie case against the debtor's assets.  The
> objecting party must then produce evidence rebutting the claimant
> or else the claimant will prevail.  If, however, evidence rebutting
> the claim is brought forth, then the claimant must produce
> additional evidence to "prove the validity of the claim by a
> preponderance of the evidence."  The ultimate burden of proof
> always rests upon the claimant.

*Matter of Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988) (quoting *In
re WHET, Inc.*, 33 B.R. 424, 437 (D. Mass. 1983)); *see also* FED. R. BANKR. P.
3001.  Under the first step of the burden-shifting framework, the bankruptcy

---

[8] Texas Estate Code section 309.151 provides that an inventory "is not conclusive"
under two express circumstances.  TEX. EST. CODE § 309.151.  Rosemarie contends that this
language suggests that, aside from these two "exceptions," an inventory is conclusive in all
other situations.    However, despite similar language in the predecessor statute to
section 309.151, the Supreme Court of Texas recognized that an inventory and appraisement
was "not conclusive on the nature or extent of the deceased's estate."  *See Republic Nat'l Bank
of Dall. v. Fredericks*, 282 S.W.2d 39, 48 (Tex. 1955) (discussing Texas Probate Code section
261, which preceded section 309.151); *see also* 18 TEX. PRAC., PROB. & DECEDENTS' EST. § 774
(rejecting an interpretation of section 261 similar to Rosemarie's and citing, inter alia, *White
v. Sheppard*, 16 Tex. 163, 167 (1856)).

court found that Rosemarie had established a prima facie claim in the amount of $3,022,163. The bankruptcy court did not clearly err at this step of the analysis.

Second, the bankruptcy court found that the Trustee's evidence valuing the claim at $1.019 million rebutted Rosemarie's prima facie evidence, shifting the burden back to Rosemarie. Specifically, the bankruptcy court credited the Trustee's evidence that (1) Sonya's bankruptcy schedules consistently listed the amount owed on the property as $1.019 million; (2) the Trustee had no basis to understand how the higher figure in Rosemarie's proof of claim and the Probate Court order was derived without a payment history; (3) Sonya had testified under oath at two separate meetings of creditors that she only owed $1.019 million on the Note; and (4) Rosemarie told the Trustee that her attorney came up with a higher figure but Rosemarie's attorney contradicted her and told the Trustee that Rosemarie and Henry came up with the figure. Given Sonya's consistent statements valuing the claim at $1.019 million, the bankruptcy court's finding that the Trustee overcame Rosemarie's prima facie evidence was not clearly erroneous.

Third, the bankruptcy court concluded that the burden shifted back to Rosemarie to establish the value of her claim by a preponderance of the evidence. Citing Sonya's signed bankruptcy schedules and sworn testimony at the creditor meetings, Rosemarie's testimony at hearings before the bankruptcy court that she did not dispute Sonya's lower figure, and Rosemarie's inability to provide a payment history to show how the value listed in the Probate Court order was calculated, the bankruptcy court determined that Rosemarie failed to establish by a preponderance of the evidence that her

claim was valued at $3,022,163.[9]     Rosemarie now disputes each of the evidentiary bases for the bankruptcy court's finding.     We address her arguments in turn.

Rosemarie claims that Sonya was "simply mistaken" when she listed the figure of $1.019 million on her bankruptcy schedules and that this figure actually represented Sonya's past due payments.  However, Sonya's filings and testimony consistently reflected this figure over a two-and-a-half-year period. In August 2009, and again in February 2012, Sonya submitted sworn bankruptcy schedules listing the $1.019 million figure.  During the same period, Sonya testified at two separate meetings of creditors that she only owed $1.019 million on the Note.  At the August 27, 2009 meeting of creditors, Sonya represented that she only owed $1 million on the Note and that she had paid the Note down $3 million since 2005 through payments to attorneys involved in the family's ownership litigation with the State, her work on the property for fourteen years, the sale of a piece of land, and some of her savings.  On January 23, 2012, Sonya again appeared under oath at a second meeting of creditors and was asked by counsel for another creditor how she reduced the value of the Note from $4.25 to $1 million.  She responded that the reduction resulted from "payment throughout the years since we had purchased the property."  Contrary to making a mistake, Sonya's statements reflect that she understood the $1.019 million figure to represent the total amount she owed to pay off the $4.25 million Note.

---

[9] Because Rosemarie was Sonya's mother, the bankruptcy court applied heightened scrutiny to Rosemarie's "insider" claim.  *See* 11 U.S.C. § 101(31)(A) ("The term "insider" includes . . . [a] relative of the debtor.").  Rosemarie does not dispute that she is an insider claimant.  "[T]he burden is on an insider claimant to show the inherent fairness and good faith of the challenged transaction."  *See In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 2004) (internal quotations omitted).  We cannot say that the bankruptcy court misapplied heightened scrutiny here.

Next, Rosemarie argues that, except for one payment of $23,000 between the Probate Court's 2008 order and Sonya's 2009 bankruptcy petition, there was no evidence that Sonya reduced the amount she owed on the Note through credits during that seventeen-month period.  She argues that the Note itself specified that it was due and payable in monthly installments of $23,000.  She contends that she never agreed to allow Sonya to deduct the costs of lawyers or other expenses involving the property from the amount due on the Note and that, to the best of her knowledge, Henry did not agree to do so either.  Even so, at other points during her testimony, Rosemarie stated that she "[wasn't] saying [Sonya] was lying" and that Rosemarie's attorney had all her records.  When asked directly about the discrepancy between her testimony and Sonya's, she stated: "I have no idea . . . I don't fool with attorneys, [Sonya] was dealing with that, that was her property."  Ultimately, the bankruptcy court reviewed the conflicting testimony and made a credibility determination, which is entitled to deference.  *See Dennis*, 330 F.3d at 701.

Finally, Rosemarie contends that the bankruptcy court clearly erred by finding that she did not dispute Sonya's figure of $1.019 million and that her testimony was inconclusive as to the value of the Note.  Though Rosemarie expressly stated several times during her testimony that she did not dispute Sonya's figure of $1.019 million, she disputed it in fact by offering a higher valuation of the claim.  However, Rosemarie also testified that she could offer no support for her higher figure and did not know how it was calculated.  Thus, the bankruptcy court's finding that Rosemarie's testimony was inconclusive was not clear error.  *See In re Acosta,* 406 F.3d 367, 373 (5th Cir. 2005) ("As long as there are two permissible views of the evidence, we will not find the factfinder's choice between competing views to be clearly erroneous." (citing *Anderson v. Bessemer City,* 470 U.S. 564, 574 (1985))), *abrogated on other*

*grounds by Matter of Scarbrough*, 836 F.3d 447 (5th Cir. 2016). To reverse a bankruptcy court's factual findings, we must, after reviewing all the evidence, be "left with the definite and firm conviction that a mistake has been made." *See Templeton*, 785 F.3d at 152 (internal quotation marks omitted). Because we cannot so conclude that a mistake has been made here, we affirm.

## B

Rosemarie next argues that the bankruptcy court penalized her for not having a documented payment history due for reasons outside of her control. She asserts that her books and records of payment were lost because of flooding by Hurricane Ike, which hit Galveston, Texas, in September 2008, and that the subsequent deaths of her husband and attorney impeded her ability to provide a payment history to support her claim. The bankruptcy court provided Rosemarie an opportunity to submit additional authorities in support of her Act-of-God argument, and nothing in the record suggests that the bankruptcy court disregarded these authorities. By contrast, the bankruptcy court's reasoning clearly shows that it rejected Rosemarie's higher claim based on her own testimony that she did not dispute Sonya's $1.019 million figure. Considering Rosemarie's heightened burden as an insider claimant to prove "the inherent fairness and good faith of [her claim]," *see In re Harford Sands Inc.*, 372 F.3d 637, 641 (4th Cir. 2004), the bankruptcy court did not clearly err, *see Nat'l Gypsum*, 208 F.3d at 504.

**\*\*\***

For these reasons, we AFFIRM the judgment of the district court.