**In re WHET, INC., Debtor.**

**Bankruptcy No. 80–1542–HL.**

United States Bankruptcy Court,
D. Massachusetts.

July 1, 1981.

---

David Ferrari, S. Natick, Mass., trustee.

Jon D. Schneider, Goodwin, Proctor & Hoar, Boston, Mass., for trustee, Ferrari.

Jan Ira Gellis, Gellis & Melinger, New York City, for WHET, Inc.

Gerald T. Weiner, Weinstein & Weiner, P. C., Bridgepost, Conn., for Anthony Martin-Trigona.

Richard Belford, Belford, Belford & Coan, New Haven, Conn., trustee.

## MEMORANDUM ON SALE AND RELATED MATTERS

HAROLD LAVIEN, Bankruptcy Judge.

WHET, Inc. originally filed a Chapter 11 in the Bankruptcy Court of the Southern District of New York along with at least one other Chapter 11 involving a Connecticut radio station. In both Chapter 11's, Anthony Martin-Trigona was the alleged sole stockholder and controlling factor. Venue was challenged and Judge Galgay determined that venue of the Connecticut station Chapter 11 belonged in Connecticut and that the WHET, Inc. Chapter 11 belonged in Massachusetts and, after an unperfected appeal, both cases were so trans-

ferred on September 3, 1981. Further arguments at which Mr. Trigona was always represented on the matter of venue, took place before me and that matter, as well as Anthony Martin-Trigona's capacity to operate these stations from federal prison, where he was incarcerated for felonies involving moral turpitude, and the separate consideration of his previous questionable, if not actual, mismanagement of the station were laid to rest with the appointment of a trustee on September 18, 1980. *See* Memorandum, Findings and Order for Appointment of Trustee, (WHET, Inc., [September 19, 1980. D.Mass. Lavien, B.J.]).

This case, with all of its complications and ramifications, has been administered by the Trustee under the supervision of the U. S. Trustee and, when appropriate, by hearing in this Court for the past nine-and-one-half months.

No plan was proposed nor has even the remote possibility of a plan been suggested by any of the parties in interest, including Anthony Martin-Trigona, the Trustee, or the creditors, who consist of the Shawmut Community Bank, N. A. (a secured creditor in the amount of $87,774), the Internal Revenue Service (with a priority claim of $72,-742), WCRB ($342,000), unsecured creditors ($272,280), four creditors with undisputed claims in the amount of $350,000, and Anthony Martin-Trigona, as a creditor, asserting five claims totaling $2,571,882, (claims how held by Martin-Trigona's trustee).

It was apparent from the beginning that a boot strap internal reorganization was impossible. Martin-Trigona's two years of operation had left the station depleted of any liquid assets. Tax returns for the years 1978 and 1979 showed losses of $235,917 and $222,569, respectively. The station's very operational ability was in jeopardy. It operated in leased facilities and the Lessor, the original owner, was claiming defaults and termination. In fact, one of the first acts of the Trustee was to institute actions against the Lessor to try to prevent the termination. Adverse results in this dispute with the Landlord and Lessor were avoided by an arrangement to pay the Les-

sor out of a proposed sale. The station, according to the Trustee, needed a minimum of $150,000 of outside capital for operation, plus what it would take to pay the creditors under any plan. Anthony Martin-Trigona offered no source of outside capital. In fact, he, himself, filed in Connecticut a Chapter 11. Incidentally, although a trustee has been appointed in that case, the Trustee has taken no active part in these proceedings other than to file a written objection, somewhat belatedly, to the sale. It should be obvious that any outside investors would be unlikely to invest as long as there could not be a complete change of ownership since the F.C.C. requirements on the station's renewals, which are now in process, consider the stockholders' moral fitness, and Anthony Martin-Trigona's conviction of a felony involving moral turpitude would present a substantial obstacle to any reorganization other than a reorganization that involved a complete change of ownership, i. e., a sale.

While sales (monthly billings) under the Trustee had risen from $15,000 to $30,000, earnings were only a modest $8,249.75 for the period August 15, 1980 to March 31, 1981, hardly enough to finance a plan internally. In this posture, the Trustee early determined that a sale on a going-station basis was the only feasible salvage route and proceeded on a two-pronged simultaneous approach: first, to keep the station operating and to improve the station as much as possible, so that it could produce the best possible price and, secondly, to merchandise the station. In pursuit of the merchandising of the station, the Trustee prepared a brochure describing the station, its operation and its finances, which he distributed to 40–50 potential purchasers. The brochure was subsequently revised and remailed to a now increased list of 60–70 potential buyers.

Ultimately, the Trustee negotiated with the Lessors, the right to sell as a package, the tower, the lease, and WHET assets and rights, provided the sale was for at least $700,000., the Lessor would receive $342,000, and that a sale be negotiated and submitted for court approval by June 5, 1981.

The Trustee negotiated a sale of $850,000 and gave notice of the proposed sale as required under 11 U.S.C. § 363(b). In addition to the statutory requirement of notice and hearing for objections, this Court, as a standing practice, requires the notice to also provide for counter-offers and, in the event any are received, that at the hearing, the original offeror and all counter-offerors, after disposing of any differences among the bidders, would be given an opportunity to submit in writing one final bid each. As a result, in every private sale, there is the potential for its becoming, under this two-tier process, a sealed bid auction with a pre-established floor.

■ In the proceeding at hand, the § 363(b) notice of the proposed sale of assets was mailed to all scheduled creditors more than 20 days prior to the hearing in accordance with Local Interim Rule 2002(b). In addition, the notice was published in the Wall St. Journal on June 1, 1981 (Eastern Edition), June 2, 1981 (Southwestern Edition) and June 3, 1981 (Midwest Edition) and in the June 1, 1981 edition of Broadcasting Magazine. The notice was also mailed to a list of approximately 60 attorneys, brokers and interested parties who were identified by the Trustee as having an interest in radio stations. I find the notice to be in compliance with the Order Approving Notice of Intended Sale and Related Means of Notice, adequate and appropriate to the particular circumstances.

As a result of the notice, three counter-offers were received: $900,000 by Irving H. Busney, $875,000 by Acton Corporation, and $876,000 by Collins/Flatley. Objections to the intended sale were filed by Shawmut Community Bank, N. A., Affiliated International Investors, Inc., Donna L. Wolske, and Anthony Martin-Trigona.

Although Anthony Martin-Trigona had always been represented by counsel and had counsel of record in the person of Jan Ira Gellis, a request came from Gerald T. Weiner of Connecticut, a non-member of the Massachusetts Bar or of the Bar of the Federal Court for the District of Massachu-setts, to be admitted to appear before this Court on behalf of Anthony Martin-Trigona. The request was promptly allowed with the caveat that since Martin-Trigona already had counsel of record, the question of Mr. Weiner's authorization would be open at the hearing. Mr. Weiner, in addition to filing an objection on behalf of Anthony Martin-Trigona, also filed a motion seeking to transfer venue to Connecticut and for a Writ of Habeas Corpus Ad Testificandum to have Martin-Trigona brought to court for the hearing.

At the June 19, 1981 hearing on the § 363(b) sale, question was raised as to Attorney Weiner's appearance, since Anthony Martin-Trigona's counsel of record had neither withdrawn nor appeared. Mr. Weiner was allowed to appear for Martin-Trigona on his oral representation that both Anthony Martin-Trigona and counsel of record had authorized his appearance and that if he was not allowed to appear Martin-Trigona would not be represented. Attorney Weiner was allowed to participate on behalf of Anthony Martin-Trigona, although there exists a serious question of Martin-Trigona's standing at these hearings,[1] since there was no debtor-in-possession in either the Massachusetts WHET case or the Anthony Martin-Trigona individual case in Connecticut. In both cases, trustees were appointed by the court and, under 11 U.S.C. § 541(a), the estate thereby created is represented by the Trustee as its legal representative, 11 U.S.C. § 323(a). However, since Martin-Trigona allegedly was the sole stockholder (a matter of dispute since all or part of the stock was pledged to secure the original purchase which was now in default) and an alleged creditor for $2,500,000 (a matter vigorously contested by the Trustee) and, as he was in a Chapter 11, not a Chapter 7, in Connecticut and, therefore, might claim a residual interest in the event of a successful reorganization, Mr. Weiner was allowed to participate.

■ The request for the Writ of Habeas Corpus Ad Testificandum was denied since

---

1. *See In re J. M. Wells, Inc.*, 575 F.2d 329 (1st Cir. 1978).

neither within the request nor in counsel's representations to the Court, were any facts alleged indicating in what way in this § 363(b) hearing, Martin-Trigona's presence would add anything to aid the Court in determining whether or not the sale should be confirmed. As to the adequacy of the price, the Court accepted Martin-Trigona's submission of an appraisal at $1,500,000. As to anything further, there was no offer or proof to indicate that Martin-Trigona would testify as to any source of funds or any suggestion of a possible plan as a feasible alternative to the sale.[2]

The change of venue was denied. That matter had not only long before been determined when the radio station cases were sent from the Bankruptcy Court of the Southern District of New York, one to Connecticut and one to Massachusetts, but the estate has been almost fully administered and a potentially advantageous sale would needlessly be put at risk with no showing of any likely benefit to the creditors or to the Debtor and, certainly, a change of venue to Connecticut would not be convenient for the WHET creditors. The interest of justice would be best served by continuing the administration as presently constituted. *See* 28 U.S.C. § 1475.

One counter-offeror, Collins/Flatley, who had bid $876,000., withdrew so that the objections to that bid were moot and not considered by the Court.

Objections to the bid of Acton were considered and denied. Although the original bid was somewhat bare bone in its brevity, it was clarified at the hearing by the Trustee announcing he had received a more explicit offer, accepting and meeting all of the terms and conditions of the Trustee's original offer and notice, and this was reaffirmed in open court by the bidder.[3]

The Bank's objection was satisfied by a stipulation that such liens as it had and that were determined to be valid would be transferred to the proceeds.

Hearing then commenced on the general objections to the sale. Neither Donna L. Wolske nor Affiliated International Investors, Inc. were represented at the hearing. It was, however, represented to the Court that Affiliated International Investors, Inc. was another of Anthony Martin-Trigona's controlled interests. In any event, the thrust of all three general objections were, one, to the inadequate consideration and, two, to the impropriety of a sale instead of a plan of reorganization. None of the objectors submitted or suggested a possible plan. It became apparent that Attorney Weiner was not going to be able to conclude his examination of the Trustee and his presentation of his objections before adjournment, so the hearing on the general objections was continued until June 23rd, 1981.

The three remaining bidders then submitted their final written bids, each having then agreed that all of the terms and condi-

---

2. Anthony Martin-Trigona has not only offered no constructive assistance in the previous administration of this estate but has, instead, attempted to thwart the efforts of the Trustee at every stage. He first filed in New York where the court found no basis, he attempted to have the Trustee removed, he opposed the borrowing of even insignificant amounts necessary for improved operations, he brought suit against the station's general manager, he objected to the sale of excess equipment, he now seeks a transfer of venue, and he has filed multiple pleadings before the F.C.C. seeking to first block and then revoke the transfer of the station's license to the Trustee.

3. As to the adequacy of Acton's original submission, Paragraph 6 of the Trustee's notice required only that a bid be submitted in writing. The contract terms were to be those set out in the original offer and the Trustee's notice. As to the adequacy of the deposit, the Letter of Credit had a termination date, however, it was immediately convertible to cash if Acton's offer was accepted. If Acton did submit the high bid and the sale to Acton was approved by the Court, the Trustee would convert the Letter of Credit to cash immediately if Acton did not agree to delete the July 15, 1981 date; thus, the termination date was of no practical effect. As to Acton's evidence of qualification for F.C.C. licensure, a satisfactory letter from Acton had been submitted to the Trustee, and counsel with F.C.C. expertise had advised the Trustee that because WHET is not within 100 miles of *both* of Acton's other two radio stations, there would be no problem with the F.C.C.'s multiple ownership rules.

tions of the original offer and the Trustee's notice would be the basis of their bids, subject to the determination of the Court at the continued hearing on the objection and on condition that the 20% deposit would be increased to 20% of the prevailing bid. Acton was the prevailing bid at $1,250,001.50. The other two bids were Bloom, $1,154,-180.18 and Busney, $1,026,037.

At the June 23rd adjourned § 363(b) hearing on the objection to the sale, Attorney Weiner announced a potential conflict of interest. It appears that when he returned to Connecticut, he discovered another member of the firm represented Acton in Connecticut on an unrelated matter. Attorney Weiner informed the Court that he had not been involved in the Acton matter and that counsel for Acton, who was present in the courtroom, was aware of all of the facts and had no objection to his proceeding. Counsel for Acton so advised in open court. Attorney Weiner further stated that he had discussed the matter with Anthony Martin-Trigona by telephone and Martin-Trigona had told him to continue and that he was sending a letter the next day authorizing him to continue and, therefore, Attorney Weiner was prepared to go forward. Question was raised by other counsel as to how binding Martin-Trigona's oral authorization would be, and the Court then undertook to question Attorney Weiner as to how explicit his conversation and instructions were, and counsel repeated his firm feeling that Martin-Trigona had been given all of the facts, understood, and wanted him to continue, and that he was personally satisfied that there was not a problem but that since Martin-Trigona had stated he was confirming his instructions in writing, he would not object to a short continuance to allow the letter to arrive. In answer to the Court's question, counsel stated that it should take two or three days to receive mail from the penitentiary in Missouri.

The Court continued the hearing for seven days to June 30th, 1981, on Acton's representation that they would stand bound for a short continuance. Seven days seemed reasonable in light of counsel's representation that a letter of authorization from Martin-Trigona was already on the way but, further, since Martin-Trigona had a counsel of record, Mr. Gellis, who, presumably from Mr. Weiner's statements originally to the Court, was aware of Mr. Weiner's appearance and authorized it, could appear if Mr. Weiner could not, and that if Anthony Martin-Trigona changed his mind and wanted neither attorney, he would be talking to Attorney Weiner that evening and it was not unreasonable to require a prompt decision and representation in light of what now appeared to be a very advantageous sale that could be placed at risk by further delay by a person with questionable standing.

The Trustee has been something less than prompt or current in his filing of the required financial reports with the U. S. Trustee who, nonetheless, testified that the Trustee's reporting was considered satisfactory. The most recent operating statement was for the period August 15, 1980 (the date of filing) to March 31, 1981 filed on April 28.. Martin-Trigona uses this as an excuse for his inability to file a plan. Of course, this overlooks Martin-Trigona's complete control of the records and operations for the two years he owned the stock of the Debtor just prior to the appointment of trustee in September of 1980 and the availability of earlier reports and, since April 28, of the Trustee's seven month report. Further, since Martin-Trigona is very critical of the Trustee's operation, he certainly would not rely heavily on that in making his own projections were he in any position to do so. The Trustee's reporting lapses are not to be condoned and will be considered when dealing with his compensation; however, they do not effect the immediate question of the appropriateness of the pending sale.

Martin-Trigona also alleges that the Trustee failed to comply with 11 U.S.C. § 1106(a)(5) in that he did not propose a plan or file a report as to why he would not file a plan or recommend conversion to Chapter 7. It is true that the Trustee has filed no such specific written report; however for the reasons previously detailed, the

Trustee had repeatedly made it clear that no plan prior to a sale was feasible.

No one who would challenge that conclusion has come forward with any viable alternative. It should be noted in this context that 11 U.S.C. § 1121(c) was a deliberate, considered, and substantial change by Congress from the limitations of the old Chapter X where only the trustee, or under Chapter XI, only the debtor could propose a plan. Under the Code, the Trustee not only no longer has the exclusive right to propose a plan, but Section 1121(c) explicitly opens the door for "Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan . . .". Again, no one has even suggested the outlines of a plan.

Anthony Martin-Trigona's trustee had Attorney Weiner file a belated written objection at this hearing merely stating that reorganization might produce more than a sale. This objection was unsupported by any analysis.

On Friday, June 26, 1981, Attorney Weiner advised the Court by telephone that he had not received written authorization and that he was withdrawing. My law clerk immediately advised Attorney Gellis, counsel of record, that the hearing scheduled for June 30, 1981 at 10:00 A. M. could not be further delayed and that he, as counsel of record, should be prepared to attend.

On Tuesday, June 30, 1981, the § 363(b) hearing resumed and Attorney Weiner read a letter dated June 26, 1981 from Anthony Martin-Trigona, stating,

"Based on the information available to me here in Missouri, I hereby wave (sic) any conflicts of interest on my own behalf and on behalf of WHET, Inc., concerning your representation of Acton Corporation."

Attorney Weiner felt that the letter and Anthony Martin-Trigona's other actions were equivocal enough for him not to proceed without Martin-Trigona's presence and insisted on his right to withdraw. Mr. Belford, the Trustee of Anthony Martin-Trigona's Chapter 11, did not appear but relayed a desire to speak to Attorney Weiner before he withdrew. After a brief recess, Attorney Weiner reported he had spoken to Mr. Belford who stood on his written objection but did not intend to appear either today or at any continuance. Mr. Weiner then delivered and read into the record an objection by Anthony Martin-Trigona to a $7,000 loan requested by the Trustee to equip a remote mobile studio. The Court allowed Mr. Weiner's requests to extend the time for appeals on the Motions for Change of Venue and Habeas Corpus Ad Testificandum and extended the time to July 19, 1981, the maximum available under Rule 3(c) of the First Circuit Rules Governing Appeals from Bankruptcy Judges. Attorney Weiner was allowed to withdraw, although it was pointed out that since Attorney Gellis had not appeared and had reported he had been instructed by Anthony Martin-Trigona not to appear and no other counsel had come forward, Anthony Martin-Trigona, for whatever interest he had, would no longer be represented. A brief further continuance was considered but since it was apparent that Anthony Martin-Trigona from his previous attitude in the case, his instructions to Attorney Gellis and his equivocal positions toward Mr. Weiner (Note that he had unequivocally told Mr. Weiner first on the evening of June 22nd, in anticipation of the hearing on June 23rd, that the letter waiving any conflict of interest would be in the mail on the morning of June 23, 1981; but in fact, the letter finally received by Attorney Weiner was dated June 26, 1981), the litigation against the Court he was purportedly filing in the District Court for the Western District of Missouri, the fact that a short continuance was unlikely to produce new counsel, that a question even existed as to Anthony Martin-Trigona's standing, and that there was a danger of imperiling an apparently advantageous sale, the hearing went forward with Mr. Weiner in the courtroom but taking no further part in the proceedings.

■ The objectors challenge the authority of a trustee to sell substantially all the

Debtor's assets in the absence of a confirmed plan providing for such a sale. As to the authority of a trustee to sell all the assets of an estate, 11 U.S.C. § 363(b) plainly authorizes a trustee, after notice and hearing, to sell property of the estate other than in the ordinary course of business. Section 363 does not limit the quantity of property which may be sold by the trustee and case law interpreting § 363(b) is clear that the broad wording of this provision contemplates a sale of even all of a debtor's assets. In a case essentially identical to the case at hand, a United States Bankruptcy Court heard argument on the validity of a sale by a Chapter 11 debtor-in-possession radio station of all of its assets. The Court decided in favor of the propriety of the sale, stating "... there is clear authority allowing the sale of property of the estate other than in the ordinary course of business. 11 U.S.C. § 363(b)." *In re WFDR, Inc.*, 10 B.R. 109, 7 B.C.D. 514 (N.D.Ga.1981). In another Chapter 11 case, the Court concluded as follows:

1. The debtor may exercise the right under Code § 363 to sell substantially all of the assets to Acton Corporation in accordance with the terms of Acton's purchaser offer, and as agreed to by Citibank. *In Re Tele Resources, Inc.*, 6 B.R. 628, 2 C.B.C.2d 1231, 1235 (Bkrtcy.S.D.N.Y.1980).

Other Chapter 11 cases indicating judicial approval of a sale of all of the assets of the debtor include *In re Circus Time, Inc.*, 5 B.R. 1, 6 B.D.C. 458 (Bkrtcy.D.Me.1971), and *In re Alves Photo*, 6 B.R. 690, 6 B.C.D. 1187 (Bkrtcy.D.Mass.1980).

As to whether the sale by a Trustee of all the Debtor's assets must take place in the context of a confirmed reorganization plan, the case law again is clear that there is nothing objectionable about a sale of all the assets outside of a Chapter 11 plan. Although a trustee is authorized pursuant to 11 U.S.C. § 1123(b)(4) to propose a plan which provides for the sale of all or substantially all the property of the estate, this authorization is permissive and is not the exclusive authority pursuant to which sub-

stantially all the assets of a debtor may be sold. A trustee may, in appropriate circumstances, first liquidate the assets of a debtor and then propose a plan for distributing the proceeds to creditors. In *Patent Cereals v. Flynn*, 149 F.2d 711 (2d Cir. 1945), the court considered the question of whether sale of all the debtor's property in the course of administration under a Chapter X proceeding must be in pursuance of a plan of reorganization. Applying Section 216, the predecessor and model of § 1123(b)(4) of the Code, the court held:

there is nothing in Section 216 which precludes approval of a plan of reorganization after a sale of all or a substantial part of a debtor's property in the course of administration under a Chapter X proceeding. Subsection (10) merely permits a plan providing for such a sale. It does not forbid a plan where the sale has occurred before the plan is submitted for approval and there will often be a saving of time and expense in such a plan. Moreover, subsection (14) of Section 216 says that a plan of reorganization 'may include any other appropriate provisions not inconsistent with ... this chapter.

Subsection (14) appears in the Code as § 1123(b)(5).

The *Patent Cereals* case was cited as supporting authority in *In re Alves Photo Service, Inc.*, 6 B.R. 690, 6 B.C.D. 1187 (Bkrtcy. D.Mass.1980). After confirming the sale of all the Debtor's assets, the *Alves Photo* court was asked to convert the proceedings to Chapter 7 on the ground that selling the assets outside of a plan was an abuse of Chapter 11. The court held that no conversion was necessary and specifically dismissed the argument that the sale of all of the assets may only be accomplished through a plan.

The only Code case where the court did impose plan prerequisites is *In re the D. M. Christian Company*, 7 B.R. 561, 7 B.C.D. 87 (Bkrtcy.N.D.W.Va.1980). That case, however, has not been followed by any other court and completely ignores the existence of § 363(b). Courts before and after the enactment of the Bankruptcy Reform Act

of 1978 (the "Act") have rejected the *Christian* approach. Prior to the enactment of the Act, the 8th Circuit, under the more rigid Chapter X, concluded as follows:

> After a petition has been approved, the District Court may exercise its discretion in ordering the sale of all or of a portion of the assets of the debtor. There is no requirement that a plan for reorganization must be submitted, nor even that the sale be in aid of reorganization, or that it await a liquidation in straight bankruptcy. *In re Dania Corporation,* 400 F.2d 833, 836 (5th Cir. 1968).

The objectors also argue that the Code imposes upon the Trustee the obligation to prepare a plan of internal reorganization, or, in the alternative, to either report why he will not file such a plan or to recommend conversion or dismissal. They base this obligation on 11 U.S.C. § 1106(a)(5) and assert that its requirements have not been satisfied here. There are two problems with this contention. First, I find that the Trustee did report orally on October 23, 1980, and on several occasions thereafter that a plan without a change in ownership was not possible and, hence, that a sale was the only feasible means of reorganization. Secondly, reorganization in Chapter 11 encompasses more than internal reorganization. It can mean a sale of the assets followed by a plan providing for distribution of the proceeds. See *In re Alves Photo Service, Inc.,* 6 B.R. 690, 6 B.C.D. 1187 (Bkrtcy.D.Mass.1980).

There are circumstances where the proposed sale of substantially all the assets of the Debtor would be inappropriate despite the authority of Sections 363(b) and 1123(b)(4) and the cases decided thereunder and, upon objection, not allowed by the Court. Such circumstances might include cases where the assets have not been properly exposed to the market or where the sale has been arranged by the debtor who is to have an interest in the purchasing entity. In this case, the independent trustee has widely advertised the assets and the debtor has no connection with the proposed purchaser.

I find these additional facts which support the need for proceeding without further delay. Although a broadcasting license cannot be sold, as a practical matter interested persons will pay large sums of money for the right to take over a license. The Debtor's license expired April 1, 1981. Although the Trustee has filed an application for renewal with the F.C.C., at present the station is operating on "temporary authority". The Debtor is therefore vulnerable to competing community groups' proposals to the F.C.C. for takeover of the license. In real terms, this means that the Debtor's principal asset is at risk which increases with the passage of time. Moreover, the station's existence to date was only made possible by $10,000 loan from Charles River Broadcasting. Further, if the sale does not go forward, Charles River Broadcasting is freed from its agreement with the Trustee and would be in a position to consider conveying its fee interest in the land to third parties who have recently expressed interest in it for non-radio purposes.

With respect to the value of the assets to be sold, the Court has before it the following:

(a) an appraisal dated August 11, 1980 by Abe Goldstein valuing the equipment and license of the Debtor at $496,848. The appraisal was obtained by the State Court receiver appointed prior to the commencement of these proceedings and, while it is not stated, is presumedly a cash, auction sale value. Various items of equipment have been sold and purchased in the ordinary course of business, but the assets to be sold are substantially those addressed in this appraisal.

(b) an appraisal dated February 19, 1981 by The Keith W. Horton Company, Inc. valuing the station at $775,000 provided that the land and transmitters used by the station were included and at $525,000 to $550,000 if the station were sold with the land and transmitters subject to a 23 year lease at $1,250. per month. This appraisal was obtained by the Chapter 11 Trustee during the course of these proceedings and is based upon a cash sale

such as is proposed by the Trustee. The appraisal has been updated by an affidavit of Robert I. Kimel dated June 10, 1981. The assets to be sold by the Trustee include ownership of the transmitter tower, but the land on which the tower is located will be leased on the terms described in the appraisal.

(c) an appraisal submitted by the Anthony Martin-Trigona interests dated June 14, 1979 by Blackburn & Company updated by a letter dated May 27, 1981 valuing the station at $1,500,000 assuming that a seller would take a downpayment of 30 percent and finance the balance over ten years at 12 percent interest. The appraisal is based upon "fair market value" which, according to the appraiser, applies "only if the buyer is under no compulsion to sell." The Trustee testified that this appraiser has acted as a broker representing a potential acquirer of the station (one who has not submitted a bid). Considering the disadvantageous low interest long-term financing on which this appraisal is based and the practical differences encountered in a bankruptcy sale from that of a "buyer under no compulsion to sell", I would feel compelled to give this appraisal something less than its face value.

Although the disparity between the appraisal figures is substantial, in these circumstances it does not impede the Court's determination of whether the offer made by the high bidder, Acton, is reasonable since Acton's cash bid is probably equivalent to, if not superior to, the highest appraisal figure, a figure which is a credit sale figure based on a long-term, low-interest rate, and an ideal sale situation.

The sale received, in fact, the broadest publicity and advertising. The Trustee advertised the proposed sale in the Eastern Edition, the Southwestern Edition and the Midwestern Edition of the Wall Street Journal and, also, placed an ad in the Broadcasting Magazine. Notice was sent to all of the creditors, in addition to 60–70 potential purchasers. The result was four original bidders and an ultimate high bid that increased the original offer from $850,000 to $1,250,001.50.

I find the Acton Corporation bid a fair and reasonable offer and its acceptance in the best interest of the estate and of the creditors, and that since all of the provisions of the Code and, particularly 11 U.S.C. § 363(b) have been complied with, the sale to Acton Corporation of WHET, Inc.'s operating assets and licenses, all in accordance with the terms and conditions as set forth in the Trustee's notice which included the original terms of the offer, for the price of $1,250,001.50 is authorized and approved, and the Trustee is directed to take all the necessary steps to consummate the transfer of the licenses and the sale.