**In re COASTAL INDUSTRIES, INC. and Coastal Tank Lines, Inc. Debtors and Debtors In Possession.**

**COASTAL INDUSTRIES, INC. and Coastal Tank Lines, Inc., Plaintiffs,**

**v.**

**UNITED STATES of America INTERNAL REVENUE SERVICE, et al, Defendants.**

**Bankruptcy Nos. 586–765, 586–766. Adv. No. 586–0186.**

United States Bankruptcy Court, N.D. Ohio.

July 17, 1986.

Wallace Walker, Cleveland, Ohio, for debtor.

John Schwemler, Akron, Ohio, for Chase Manhattan Bank.

Roger Stevenson, Akron, Ohio, for B.F. Goodrich Co.

Robert Balantzow, Cleveland, Ohio, for Dana Commercial Credit.

Sharon DeVries, Hampton, N.H., for Northeast Cartage Co.

Mark Richards, Markus & Pierce, New York City, for Creditors' Committee.

Ellen Keller, Cleveland, Ohio, for Press Tank & Equipment Co.

. Mark Webber, Cleveland, Ohio for Cent. States SE & SW Areas Health, Welfare & Pension Funds.

H.F. WHITE, Bankruptcy Judge.

On June 13, 1986 Coastal Tank Lines, Inc., a subsidiary of Coastal Industries, Inc., filed an adversary proceeding, being Case No. 586–0186, in which they filed a petition to sell rolling stock equipment and regulatory rights of the said debtors. This Court did on June 13, 1986 enter an order shortening the time to answer the complaint to said adversary proceeding and set the matter for hearing on the same date on which the Court scheduled a motion filed by the debtors for the authority to sell said rolling stock equipment and regulatory rights pursuant to 11 U.S.C. Sect. 363(b)(1). Said hearing was scheduled for July 10, 1986 at 11:00 AM. Due notice was made upon the approximately 283 named defendants in the adversary proceeding and due notice was given to all creditors, shareholders and regulatory commissions of the motions of the debtors to sell pursuant to 11 U.S.C. Sect. 363(b)(1).

As of the date of the hearing on July 10, 1986 there were only five objections filed to the sale as to the adversary proceeding, being various mechanics' lienholders who rendered services on individual trucks. There were several other objections which have been subsequently withdrawn. Various state regulatory commissions filed answers indicating they did not have any objection to the sale of the regulatory rights but they would be subject to the final approval as provided for by local and state law. The United States of America, Internal Revenue Service, being represented by Patrick McLaughlin, U.S. Attorney, filed an answer indicating it had no objection to said sale provided its interest was transferred to the fund. Chase Manhattan Bank, individually and as agent for Continental Illinois National Bank and Trust Company of Chicago and First National Bank of Ohio filed an answer setting forth

their secured claim and requesting that this court make a determination they have first priority as to the property being sold and that the funds derived therefrom be setoff to them to cover their secured indebtedness as provided for by the purchase agreement.

On June 13, 1986 Coastal Industries, Inc. and Coastal Tank Lines, Inc. also filed a motion and application of the debtors for the issuance of an order granting the authority to sell its equipment and regulatory authorities as set forth in adversary proceeding 586–0186. Due notice of said motion which was scheduled for hearing on July 10, 1986 at 11:00 AM was given to all creditors as heretofore set forth.

C.W. Tank Lines, Inc. filed an objection to said motion on July 3, 1986. On July 7, 1986, Northeast Cartage Company, Inc. filed an objection to said motion.

At the hearing on July 10, 1986 the attorney for the creditors' committee and the attorney for Central States Southeast and Southwest Areas Health and Welfare Pension Fund appeared in opposition to said motion.

The Court did enter an order on July 10, 1986 just prior to the hearing in which it approved the creditors' committee that was organized and elected officers on July 9, 1986 and that had designated their counsel of record.

The Court, after extensive hearings over 2.5 days of testimony, makes the following Findings of Fact and Law.

## FINDINGS OF FACT

1) The debtors on June 3, 1986 did file a voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code.

2) Coastal Tank Lines, Inc. is a subsidiary of Coastal Industries, Inc., located in Akron, Ohio, which carries on extensive business of hauling by tank trailers petroleum products and chemical products throughout much of the United States and portions of Canada.

3) Coastal Tank Lines, Inc., hereinafter referred to as "Tank Lines", was incorporated in 1940. Coastal Industries, Inc., the holding company, was incorporated in 1964. The president and chief operating officer of both corporations is Howard Ryder.

4) Tank Lines suffered operating losses in 1983 of $2,900,000. In 1984 they suffered losses of $7,900,000. For the fiscal year ending 1985 they sustained a profit of $106,000. However, since October, 1985 to the time of filing the Chapter 11, the debtors have sustained further losses.

5) On January 14, 1986 the insurance company covering casualty and liability for Tank Lines notified the debtor that there would be a substantial increase in premiums for the insurance year which would begin June 1, 1986 and that the insurance premium for the year would amount to approximately $4,500,000 for $5,000,000 coverage per incident plus a new deductibility of $50,000. It was also indicated that property damage insurance which previously had been $50,000,000 with a $25,000 deductible at a cost of approximately $442,000 would be decreased to $10,000,000 with a $25,000 deductible with an increased premium cost of $1,841,735. The insurance company further indicated that no coverage would be extended after June 1, 1986 unless a deposit of $1,000,000 was paid in advance and further that the secured creditors, being a consortium of banks headed by the Chase Manhattan Bank, would agree that they would not call their loans during the insurance year of 1986.

6) On May 26, 1986, Chase Manhattan called its loans on behalf of the consortium. The banks ordered Tank Lines to cease operation as of 7:00 AM on Tuesday morning, May 27, 1986, but agreed to forego principal and interest temporarily so that the drivers and owner-operators could be paid $1,100,000 in wages by way of a three week holdback, and the shutdown of the operations would proceed in an orderly fashion. Their collateral, being tanks and trailers, could then be returned in operable condition to the terminals. At this time Tank Lines was carrying approximately 240–250 loads per day. The immediate cessation of operations would result in numerous claims by its customers against Tank

Lines and endanger the collection of accounts receivable.

7) Howard Ryder the following day contacted by telephone the major companies in this branch of the shipping industry including Chemical Leaman Tank Lines, Inc., hereinafter referred to as "Chemical Leaman" to determine if there was any interest on its part in the purchase of assets of the company. This generated some interest, the largest offer being that of Quality Carriers which offered $1,062,000 for 120 of the 460 trailers. Leaseway offered $250,000 for the operating authorities of Tank Lines.

8) On May 27, 1986, Mr. Ryder contacted Sam Nimes, chairman of the board of Chemical Leaman, who expressed some interest the following morning in purchasing all the equipment and regulatory rights.

9) On May 30, 1986 Chemical Leaman requested that the consortium of banks be present at the time they entered into discussions regarding the purchase of the tractors and trailers and regulatory rights of Tank Lines. A memorandum of said purchase agreement was concluded on said date which was subsequently drafted as the Purchase Agreement and signed by the parties on June 9, 1986, being Debtors' Exhibit 6 with attachments. On the same date, May 30, 1986, a lease agreement was entered into between Tank Lines and Chemical Leaman, being Debtors' Exhibit 7.

10) The financial difficulties and the insurance crisis facing the debtors had been widely publicized in the business section of the Akron Beacon Journal on May 30, 1986 and it had been announced publicly in the morning edition on Saturday, May 31, 1986 that Tank Lines would cease operations as of May 31, 1986. However, communications were immediately forwarded to the management, employees and customers of Tank Lines regarding its agreement with Chemical Leaman on May 31, 1986. These communications also insured that service would be continued. These efforts were to counter the effects of adverse publicity.

11) The agreements, being Debtors' Exhibits 6 and 7, did provide a 90/10 division of operating revenues, 10% going to Chemical Leaman and 90% to Tank Lines, for the purposes of continued operation. Chemical Leaman provided the necessary insurance, and lent its name to the tractors. Chemical Leaman immediately made provisions for the return of approximately 800 tires that had previously been seized by B.F. Goodrich when it became aware of the financial crisis of Tank Lines. Chemical Leaman also provided fuel for the terminals and on the roads for the operation of the vehicles. Chemical Leaman had the responsibility of collecting accounts receivable which were on a thirty day billing. It would advance payment to Tank Lines seven days after the presentation of an invoice by Tank Lines to Chemical Leaman for that account.

12) This Court did approve a cash collateral order agreed to by the consortium of banks in the sum of $1,100,000 for the purpose of paying the drivers and owner/operators so that the trucks would continue to operate. Said order was entered on June 9, 1986.

13) The Court further finds from the testimony of Lisa Brady who is trust officer for National City Bank of Cleveland which is collateral trustee for the consortium, that she is holding the original certificates of title for the tractors and that on each title is duly recorded the liens as required by the various states. As the collateral trustee and trust officer, she verified the copies as set forth in Debtors' Exhibit 10 as being true copies of the original documents in her possession and charge.

14) The Court further finds that the collateral trustee has in her possession financing statements duly perfected by filing with the Secretary of State and the County Recorder of Summit County, Ohio, and signed security agreements, the originals being in her possession covering all the trailers as required by law, and copies of all operating authorities and certificates of public convenience. *See* Debtors' Exhibit 10.

15) The Court further finds that the amount presently due the consortiums is $14,993,772. *See* Tank Lines Schedule A–2 filed July 11, 1986.

16) The Court finds from the testimony of Kenneth Rogers, an appraiser, that he valued the tractors owned by the debtors in September, 1985 at $2,341,500, being Debtors' Exhibit 2. Subsequently, he was requested on February 10, 1986 to make a reevaluation of the wholesale value, Exhibit 2A, and said value was $1,321,500. The appraiser indicated that since February, 1986 there is little difference between wholesale and retail value because of the glut that has been created on the market by subsequent bankruptcies, especially McLean Trucking Co., being one of the largest in the United States, and further because of the national trend of downsizing trucking operations.

17) The Court further finds from the testimony of C.J. Ruleman of Heil Co., he being an expert in tank trailers, that he made an appraisal of all the tank trailers being 269 units at fair market value, being $9,532,350. *See* Debtors' Exhibit 1. Subsequently, on February 10, 1986 he revised his estimate to 91.5% of that value being an acceptable current retail value based on individual retail sales. However, if liquidation were to take place a multiplier of 60–65% would be applied to arrive at wholesale liquidation value. Mr. Ruleman indicated there were few companies in the tank line business in the United States at this time who could absorb that many trailers. Further, he testified that subsequent economic events in the trucking industry have eroded the value of these trailers.

18) The Court further finds from the testimony of Mr. Ferris of Columbus, Ohio, an attorney specializing in transport, that the value of all the debtors' regulatory rights, both inter- and intrastate, is approximately $600,000. The most valuable right being the intrastate rights for the State of Ohio but said rights are perishable in that the trend has been for deregulation in all states. Further, the cessation of the debtors' operation would reduce the marketability of the rights and possibly jeopardize the rights of the debtor or a subsequent trustee to sell the same. *See* Debtor's Exhibit 8.

19) The Court further finds from the testimony of David Gaston of Coopers & Lybrand, a certified public accountant who has specialized in the motor freight and carrier field for the last 23 years, that he has represented creditors' committees in bankruptcy liquidations of trucking companies and that he is presently employed by the secured creditors in the McLean bankruptcy. Mr. Gaston became involved with Tank Lines in April, 1986 when the banking group requested a review of the financial condition of the debtor. Mr. Gaston did on or about April 28, 1986 visit the company offices to verify the cash flow and business plan, and indicated that he found the company records in "good shape". He verified that the company had been losing money for the last four years.

20) The court further finds from the testimony of David Gaston that on or about May 8, 1986 at a meeting that occurred in Akron, Ohio he did review the values as set forth in Exhibits 1 and 1A and 2 and 2A and he concluded that the liquidation values assessed were reasonable. Further, that he had studied the purchase agreement, being Exhibit 6 between Chemical Leaman and the debtor and that the offer would be beneficial in that it would eliminate the liquidation expenses which could possibly amount to approximately $3,517,-000. *See* Debtors' Ex. 3.

21) The Court further finds that from the testimony of Howard Ryder that when he was notified in November, 1985 that the banks desired to be taken out he did make application with several banks in Chicago and Los Angeles for financing loans. The first loan under consideration was First Chicago Trust. However, they declined to make any written committments for a loan. The debtor then in desperation tried to get financing from Foothill of Los Angeles as late as May 23, 1986. However, they were notified verbally that a possible committment would be made not to exceed $4,200,-

000 which was insufficient for the debtor to continue operations.

22) The Court further finds that Howard Ryder does have an agreement with Chemical Leaman in which he intends to form another company out of assets other than those owned by the debtors in which he will lease tanks for the purpose of hauling chemicals and petroleum products. However, there was no assurance by Chemical Leaman that such an agreement will be made and that it is an arm's length transaction in that there is no guarantee nor offer of employment.

23) The environmental problems and regulations must be considered as the debtors do haul hazardous chemicals that require special handling for the debtors' customers which are large chemical and petroleum companies and are reluctant to entrust their chemical products to persons unfamiliar in the field. There are numerous EPA regulations that must be complied with, and a potential problem as a chemical spill would expose both the customer and the tank hauling company to catastrophic liability and could seriously endanger the public health and safety, for example, the recent spill in Miamisburg, Ohio. Because of these environmental problems the potential purchasers and companies willing to assume these risks are limited.

24) Tank Lines has no assets that it may use to continue financing operations for the next thirty to ninety days and would have to immediately terminate its business operations, and would immediately cause a loss of hundreds of jobs to the present employees. This does not mean there will not be layoffs even if this transaction takes place and is approved, but it does keep the economic loss to a minimum.

25) The consortium of banks are also liable on letters of credit guaranteed by them in the amount of approximately $1,700,000. Numerous letters of credit are also secured by the assets of the debtors and one has already been called.

26) William McMahon of Buccino & Associates, a crisis management firm which was retained by the debtors to review their financial condition in July of 1984, did testify that his firm's recommendations managed to stem Tank Line's operating loss and help the company generate a small profit for the fiscal year ending September, 1984 of $106,000. They had worked with Tank Lines to obtain financing when the consortium indicated in the summer of 1985 that it did not intend to extend its loans, and Buccino prepared the liquidation document. Debtors' Exhibit 3. They indicated that the transaction which is before this Court was the only viable solution both to the debtors and secured creditors.

## ISSUE

Whether this court should approve the sale of a majority of rolling stock and intrastate operating authorities of Coastal Tank Lines, Inc., debtor and debtor in possession, before the filing of a disclosure statement and a plan of reorganization?

## DISCUSSION OF LAW

The debtors presented evidence at a hearing on their motion and application asking this Court to approve the sale of a large part of their assets to Chemical Leaman which was filed within a week after the debtors filed their Chapter 11 petitions, and before they filed their schedules, list of creditors and statement of affairs. The "drop dead" closing date of the proposed agreement is set for August 1, 1986. A request for such urgent and far-reaching relief requires the proof of compelling reasons for the great haste. The debtors have met their burden of proof.

In a recent Third Circuit decision which is factually similar to the instant case, the court held that a bankruptcy court can authorize the sale of substantially all of the assets of the estate under 11 U.S.C. § 363(b)(1) upon a proper showing that the purchase price is fair and reasonable, the sale is in the best interest of the estate, and the sale and purchase is conducted in good faith. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 14 Bankr.Ct.Dec. 606 (3rd Cir.1986). *But see,*

*In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983). In *Abbotts Dairies* the Third Circuit reversed the district court and remanded the matter back to the bankruptcy court for further determinations of fact. Unlike the instant case, the bankruptcy court did not have the benefit of appraisals, nor the opportunity to hear from representatives of the creditors' committee regarding the sale. That bankruptcy court granted the motion for approval of an interim agreement at an ex parte hearing on the day the petition was filed, and at a subsequent hearing, confirmed the sale.

■ Other factors which the bankruptcy court should consider in making its determination under section 363(b) are suggested by the Second Circuit in its seminal decision, *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir.1983): (1) whether there is an articulated business justification for selling out of the ordinary course of business; (2) whether the asset is increasing or decreasing in value; (3) what is the effect of the proposed disposition on future plans of reorganization; (4) what proceeds are to be obtained vis-a-vis any appraisals of the property; (5) the proportionate value of the asset to the estate as a whole; and (6) any other salient factors regarding the disposition of the asset. Both the Third and the Second Circuit are in agreement that the bankruptcy court must be given wide latitude and accorded great discretion in determining whether the proposed sale should be approved. *See also, In re Anchor Exploration Co.,* 30 B.R. 802, 808 (N.D.Okla. 1983). The Sixth Circuit has recently held that a bankruptcy court can authorize the sale of all of a Chapter 11 debtor's assets under section 363(b)(1) if "an articulated business reason justifies the sale." *Stephens Industries, Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir.1986).

The evidence shows, and the creditors' committee concedes, that the decision to sell was within the sound business judgment of the debtors. Tank Line has been suffering from a string of operating losses since approximately 1982. During the one recent year in which Tank Lines showed a modest profit, the lending banks urged the company to seek replacement financing. Tank Lines retained Buccino & Associates, Inc., a crisis management firm, to analyze the financial condition of Tank Lines and propose solutions for its financial difficulties. Buccino put into operation an "asset redeployment program" whereby the operations of Tank Lines was scaled down, and created an ESOP program for employees. Buccino also solicited several refinancing proposals, but each proposal was subsequently withdrawn, except for a proposal from Foothill which was refused by the banks. The banks called their loans on May 26, 1986 and discussed with Tank Lines' representatives the cessation of its operation as of 7:00 AM the following day. Tank Lines was also faced with a May 31st deadline for the payment of a $1,000,000 deposit on its insurance coverage which had escalated in cost from $442,611 to $4,500,000 in three years time for reduced coverage. The insurer also required the commitment from the lending banks that they would not call their loans for the prospective year of coverage. Without financing or insurance the only alternative to Tank Lines was to shut down.

The president and chief operating officer of Tank Lines and Coastal Industries, Howard Ryder, immediately began to contact members of the shipping industry to make them aware of the shutdown of Tank Lines and to determine if there was any interest in the purchase of Tank Line assets. An offer emerged from Chemical Leaman to purchase all the rolling stock and operating authorities for $5,200,000 in cash. The parties agreed that Chemical Leaman would provide insurance and lend its name to the tractors, and that Tank Line employees would continue to run the shipping routes using the operating authorities of Tank Lines. Chemical Leaman would collect the accounts receivable, and split the collections with Tank Lines on a 90/10 basis. Mr. Ryder testified that Tank Lines accepted this proposal as it was the best offer and it provided a greater opportunity of for employees. Chemical Leaman would also provide the name recognition required by

Tank Lines' customers and the goodwill inherent therein.

On May 30, 1986, Tank Lines negotiated these terms for its continued operation with Chemical Leaman, and representatives for the lending banks were present at the negotiations. The formal agreement among the parties is memorialized by the purchase agreement which the debtors ask this Court to approve, and an interim operating lease between Chemical Leaman and Tank Lines. *See* Debtors' Exs. 6 and 7. Apparently, the parties were to perform under the terms of the agreement outside of the protection of the United States Bankruptcy Code. However, several vendors seized equipment, B.F. Goodrich seized its leased tires at various truck terminals, and one lessor in Texas tried to padlock that terminal. Thereupon the debtors were compelled to seek protection under Chapter 11 of the Bankruptcy Code.

■ The Court concludes from this sequence of events that there was an articulated business justification for entering into the agreements with Chemical Leaman. The banks had called their loans and Tank Lines' insurance was about to expire. Tank Lines could not operate without insurance, operating funds, or without its tractors and trailers which are collateral for the loans of the lending banks. Without the operating agreement with Chemical Leaman, the shutdown of Tank Lines would result in the immediate layoff of hundreds of employees. The collection of accounts receivable could also continue in an orderly fashion under the agreements.

■ The debtors presented ample evidence that the purchase price offered by Chemical Leaman, $5,200,000 in cash, is "fair and reasonable". The debtors presented updated appraisals of the tractors and trailers, the original appraisals having been made at the request of the lending banks so that a lending formula could be determined based upon value, and an ex post facto appraisal of the operating authorities. The proper measure of value is the lower, wholesale value, and there are few tank line companies in the United States that could absorb equipment in such large number. The price of all tractors is somewhat diluted by the bankruptcy of McLean Trucking Co., and the price of all tractors and tank trailers is somewhat diluted by the scaling down of trucking operations nationally due to deregulation and consequent competition by smaller trucking lines with lower overhead costs. A certified public accountant from Coopers & Lybrand who specializes in motor carrier accounts testified that he conducted an on-site review of the financial status of Tank Lines in April-May, 1986 at the request of the lending banks, and reviewed the liquidation analysis prepared by Buccino & Associates and found it to take a reasonable approach. He agreed with the net liquidation value stated therein. *See* Debtors' Ex. 3. He testified that he experienced those types of values in other liquidations.

There is no guarantee that a piecemeal sale of the assets of Tank Lines would bring a higher price since the cost of selling the tractors and trailers would substantially reduce the net sale price.

■ It is with great care that this Court considers whether the sale of a majority of rolling stock and operating authorities of Tank Lines is in the best interest of the estate. The proposed sale would be consummated by the parties with great haste, foregoing the protections generally afforded the creditors even in a liquidating chapter 11 plan—the right to vote after full disclosure and an opportunity for review of the plan of reorganization. Some courts have held that a sale of substantially all of the assets of the estate can only be authorized upon the showing of an emergency. *Cf. In re White Motor Credit Corp.*, 14 B.R. 584 (Bankr.N.D.Ohio 1981) *with In re WHET, Inc.*, 12 B.R. 743 (Bankr.D.Mass. 1981) and *In re Tele/Resources, Inc.*, 6 B.R. 628 (Bankr.S.D.N.Y.1980). Although this Court does not believe that the Sixth Circuit requires such a showing, an emergency certainly existed under the facts of this case. The proposed sale concerns the transfer of ownership to Chemical Leaman of tractors, trailers and operating authori-

ties which are, as the evidence shows, collateral for the loans of the lending banks. Although the lending banks are further collateralized by the assets of the estate, the evidence and the schedules show that the lending banks are significantly undersecured. Without the consent of the lending banks to the proposed sale, it could not proceed, and the debtors would in all likelihood be surrending their assets to their secured lenders who had already accelerated the sums due under loan agreements. The sad fact may be that there will be no assets or funds available for distribution to the unsecured creditors.

The proposed sale does not include the sale of the accounts receivable, those terminal locations owned by the debtors, or an inventory of certain repair parts and hoses located at the various terminals, although apparently they too are loan collateral of the lending banks. Without the operating lease and proposed agreement with Chemical Leaman hundreds of employees could be on immediate layoff, although no one will guarantee their continued employment. Instead, the operating lease is generating revenue for Tank Lines to meet payroll and other operating expenses, which in turn provides the personnel necessary to collect the pre-petition accounts receivable. The insurance provided by Chemical Leaman allows for the continued operations. The sale must be consummated or a total collapse of the debtor's business operations would occur.

The Court is also concerned about the effect of a sudden termination of operations with regard to its environmental impact. Tank Lines hauls petroleum products and other chemical products which require special handling and disposition. It exposes Tank Lines and its customers to potentially catastrophic liability from an accident which could also seriously endanger the public health and safety as recently evidenced by the toxic chemical spill in Miamisburg, Ohio. Few carrier lines are willing to assume these risks, and by an orderly transfer of rolling stock and operating authorities to Chemical Leaman, a well-respected tank line company, the cus-

tomer base is saved from severe erosion and the collection of accounts receivable is enhanced. Upon careful consideration of the numerous factors necessarily involved in a sale of this nature and timing, the Court concludes that it is in the best interest of the estate.

The Third Circuit in *Abbotts Dairies* cautions bankruptcy courts to review such a proposed sale in the context of good faith as to the potential purchaser's behavior in the course of the sale proceedings. The standard elicited by the Third Circuit is the absence of that which would destroy a purchaser's good faith status at a judicial sale: " 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' " *Abbotts Dairies*, 788 F.2d at 148, 14 Bankr.Ct.Dec. at 611 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir.1978)). Although Mr. Ryder did testify that he began negotiations with Chemical Leaman regarding his formation of a new company which would provide trucks and drivers for bulk transport, there is no promise of employment and negotiations are being conducted at arm's length. The Court finds there is no evidence of fraud, collusion or self-dealing. There is ample evidence that Tank Lines has made an effort to refinance its obligations in recent months but could not find a bank or investment firm willing to do so. The appraisals submitted as exhibits, testimony of the appraisers, the liquidation analysis prepared by Buccino & Associates, and the independent review by Coopers & Lybrand present evidence of fair value for the sale.

The debtors' proposed sale has been criticized by the creditors' committee as not being advertised in *Transport Topics*, the trade weekly. But Mr. Ryder and others did contact Tank Line's major competitors which are members of a limited and highly specialized field. Few companies have the technical ability to move petroleum products and chemicals in bulk transport. This Court is not, however, naive enough to believe that Chemical Leaman provides in-

surance and some advances as operating revenues out of a spirit of generosity. The proposed sale will provide Chemical Leaman an opportunity to expand in this field.

At the final day of the hearing, the Court inquired of the attorney for the creditors' committee what other and better alternatives it could offer. He could propose none. He did urge that the expense of the shutdown and subsequent delay should be borne by the secured creditors, but where liquidation costs approach $3,500,000, it is indeed a high cost to bear without evidence that this would be justified. This Court does not believe that Congress intended the secured creditors to bear this burden. Sec-

tions 1123(a)(5)(D) and 363(b)(1) provide the exception to a sale of substantially all of the assets of the estate without a disclosure statement and plan.

The relief that the debtors request goes beyond the normal course of events in a chapter 11 proceeding, but they have presented ample evidence that the proposed sale is justified under these circumstances. It meets the tests proposed by the Second, Third and Sixth Circuits, and accordingly, the Court grants the motion and complaint. The attorney for the debtors shall prepare an order to be submitted for this Court's approval.

Exhibit A

## OPERATING AUTHORITIES

| Issuing State/Agency | Identification |
| --- | --- |
| Connecticut | Cert. No. 182 |
| Illinois Commerce Comm'n. Motor Carrier of Property Division | File No. 13699 MC<br>ILL C.C. 13699 MC-PR |
| Public Svc Comm'n of Indiana | Cert. No. 8784–A,5 |
| Iowa D.O.T. | Permit No. LC–296 |
| La. Public Service Comm'n. | Contract Carrier<br>Permit No. 1384 |
| Md. Public Service Comm'n. | Public Tank Vehicle Permit<br>P.S.C. No. 85TV–11 |
| Mass. Dept. of Public Utilities | Irreg. Rte. Common Carrier<br>Cert. No. 1834<br>Serial No. 12665 |
| Mich Dept. of Commerce<br>Public Service Comm'n. | MPS #L–9853 and MPSC #15987 |
| Public Utilities Comm'n. of N.H. | Cert. of Public Convenience and Necessity<br>No. 40<br>Property Carrier Public<br>Interest Permit No. 78 |
| Public Utilities Comm'n. of Ohio | Permit to Operate as a Contract<br>Motor Carrier No. 3545 |
| Public Utilities Comm'n. of Ohio | Intrastate Irregular<br>Cert. Nos. (of     11464–I 9/24/81<br>Public Convenience  11570–I 11/29/82<br>and Necessity)     563–I 12/4/78<br>11217–I 3/30/78<br>11187–I 1/5/78<br>7375–I 12/31/74<br>8453–I 12/31/74<br>10534–I 12/31/74<br>11425–I 2/3/81 |
| Pennsylvania | Cert. No. A60226 |
| Commonwealth of Virginia State Corporation Comm'n. | Cert. of Public Convenience and Necessity<br>Petroleum Tank Truck Carrier No. K–46 |

Issuing State/Province/Agency

Ontario Ministry of Transportation and
Communications

Commission des Transports du Quebec
(Transportation Board Province of Quebec)

Province of N.B.
Motor Carrier Board

Province of N.S.
Bd. of Comm'rs of Public Util.

Public Service Commission of W.V.

### Identification

Extra-Provincial Operating License No. X115

No. de certificate de permis M–301270–003
through M–301270–006 Dossier N. M–301270
18566–V (Permit No. 13627–V)

License No. 777, Class X–5

Extra-Provincial Operating License No. X641

P.S.C. M.C. Cert. No. F–2345
Issued in M.C. Case No. 2805
P.S.C. M.C. Permit No. H–8107
Issued in M.C. Case No. 16248
P.S.C. M.C. Permit No. H–8523
Issued in M.C. Case No. 16863
P.S.C. M.C. Permit No. H–8645
Issued in M.C. Case No. 16863
P.S.C. M.C. Permit No. H–8956
Issued in M.C. Case No. 17506
P.S.C. M.C. Permit No. H–9068
Issued in M.C. Case No. 17506
P.S.C. M.C. Permit No. H–10298
Issued in M.C. Case No. 21307