**In re JONES & McCLAIN, LLP, Debtor.**

**James A. Prostko, Trustee, Movant,**

v.

**Lisa Deangelo and Terri Michel, Respondents.**

**No. 01–29104–JAD.**

United States Bankruptcy Court, W.D. Pennsylvania.

Aug. 12, 2009.

Jonathan Jones, Middleburg Heights, OH, pro se.

James A. Prostko, Pittsburgh, PA, Trustee.

### *MEMORANDUM OPINION REGARDING TRUSTEE'S OBJECTIONS TO CLAIMS NO. 11 and 12*

Related to Doc. # s 96, 97

JEFFERY A. DELLER, Bankruptcy Judge.

The matters before this Court are joint Objections To Claims (collectively the "Objections") filed by James Prostko ("Trustee"), Chapter 7 Trustee of the debtor law firm Jones & McClain, LLP (the "Partnership"). These Objections are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(B), and this Court has proper subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b).

### I.

The Partnership was formed on April 8, 2000, to represent plaintiffs in personal injury actions on a contingency basis. Jonathan Jones ("Jones") and Thomas McClain ("McClain") were its general partners. The Partnership was dissolved as a matter of law on June 22, 2001, when Jones filed for personal bankruptcy. On August 31, 2001, Jones filed an involuntary Chapter 7 petition against the Partnership. See Dkt. # 1.

Terri Michel ("Michel") and Lisa Deangelo ("Deangelo" or collectively "Claimants") filed proofs of claim on June 13, 2002 ("Claim No. 11") and July 3, 2002 ("Claim No. 12" or collectively the "Claims") respectively.[1] The Claimants were employed by the Partnership from April 10, 2000, through May 18, 2001, to perform secretarial, paralegal and office management duties. The Claimants were dismissed without cause, due to the imminent dissolution of the Partnership. Prior to their employment by the Partnership, the Claimants performed similar duties for Jones for seven (7) or more years under the employment of Jones' previous law firm, Ogg Jones Cordes & Ignelzi ("Ogg

---

1. It is worth briefly addressing the threshold issue of the proper filing of Claim No. 11 in this case. Terri Michel filed this claim on June 13, 2002 but neglected to include a claim for severance. Upon realizing her mistake in preparation for trial, she amended her claim on April 15, 2009, to include severance. The Court is satisfied that Michel's failure to include severance in her original claim was a clerical error on her part, made in good faith by a *pro se* claimant. However, since the claim for severance is denied in full, the point is moot.

Jones"). Jones was the managing partner of Ogg Jones before beginning his new position as managing partner of the Partnership.

The Claimants, believing they were owed by the Partnership unpaid severance as well as cash payments for unused vacation time, filed proofs of claim to that effect in this bankruptcy case. The two principals of the Partnership were in disagreement as to the validity of the Claims. According to the Trustee, while Jones was supportive of the claims, McClain did not agree with the Claimants' representations, and thus McClain instructed the Trustee to object. See Audio Recording of Hearing Held May 26, 2009 at 1:47:07 to 1:47:09.[2] The Trustee, on March 3, 2009, filed an Objection to Claim No. 11 (Dkt.# 96) and an Objection to Claim No. 12 (Dkt.# 97). The Court heard testimony from the Claimants, as well as from McClain, in a joint hearing on both Objections held on May, 26, 2009.

## II.

■■■ The Third Circuit Court of Appeals has clearly established that the burden of proof for claims brought in bankruptcy proceedings under 11 U.S.C. § 502(a) rests on different parties at different times. *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173 (3d Cir.1992). Initially, it is the claimant that must "allege facts sufficient to support the claim." *Id.* at 173. If those allegations set forth all necessary facts to establish a claim and are not self-contradictory, they *"prima facie"* establish the claim. *In re Holm*, 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, *Collier on Bankruptcy* § 502.02 at 502–22

(15th ed.1991)). The burden then shifts to the objector to produce evidence sufficient to "refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Allegheny Intern., Inc.*, 954 F.2d at 173–74. If the objector is successful in doing so, "the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id.* at 174 (citing *In re WHET, Inc.*, 33 B.R. 424, 437 (Bankr.D.Mass.1983)). The burden of persuasion always remains with the claimant. *Id.* at 174 (citations omitted).

In the case before this Court, the Claimants met their initial burden upon filing proofs of claim, with supporting documents attached, that were both "sufficient to establish a claim" (*Id.* at 173) and "not self-contradicting." *In re Holm* 931 F.2d at 623. The objector, in this case the Trustee, then met his shifting burden by refuting an allegation essential to the claim, namely, the existence of a contract between the Partnership and the Claimants to pay severance and cash for unused vacation time. *In re Allegheny Intern., Inc.*, 954 F.2d at 173–74. The Claimants are thus left with the burden of persuasion with respect to the existence of a contract, which is the subject of this Memorandum Opinion. *Id.* at 173 (citations omitted).

## III.

The issues presented to this court are straightforward: Is the Partnership contractually obligated to 1) pay Claimants for accrued, but unused, vacation time, and 2) make severance payments to the Claimants? The Claimants allege that Jones, acting as managing partner of the Partnership, represented to the Claimants—and

---

**2.** Citations to audio recordings refer to the audio record made by the Electronic Court Reporting System utilized in the United States Bankruptcy Court for the Western District of Pennsylvania. A copy of the audio file, and a transcript of the same, may be obtained upon submission of a written request and remittance of the requisite fee to the Clerk of the United States Bankruptcy Court.

they consequently relied on his representations—that their employment agreement with the Partnership would be "commensurate with what was received at the Ogg Jones firm." Audio Recording of Hearing Held May 26, 2009 at 1:52:12 to 1:52:26.

For the Claims to survive the Trustee's objections, the Claimants must meet their burden with respect to two basic allegations. First, they must show that Jones did, indeed, commit the Partnership to providing employment benefits and policies to the Claimants commensurate with those they received as employees of Ogg Jones. Second, the Claimants must show that the severance and vacation benefits they allege are owed to them by the Partnership were, in fact, in place at Ogg Jones during their tenure at that firm. In doing so, the Claimants will have established the existence of a contract between the Partnership and the Claimants. This Court finds that the Claimants have met their burden with regards to the existence of a contract to pay for accrued, but unused, vacation time. They have not, however, met their burden with regards to establishing the existence of a contract to pay severance.

### IV.

█ Beginning with the question of cash for unused vacation, there are several important facts presented on the record. First, there is the testimony of the Claimants, Michel and Deangelo. Both Claimants have testified that Jones represented to them, in approximately late March of

2000, that the soon-to-be formed Partnership would provide to them the benefit of the same compensation and employment policies provided by the Ogg Jones firm. In the words of Michel, Jones conveyed that "everything would stay the same, vacation, seniority" and that "all the policies that existed at the Ogg Jones firm would carry over." Id. at 2:22:42 to 2:23:44. Additionally, the Claimants contend that Ogg Jones had a policy of providing cash for accrued, but unused, vacation pay to its employees. Michel claims to have knowledge of two prior employees of Ogg Jones, namely Shelly Molenda and Julia Cheia, having received such cash payments upon their dismissal without cause from Ogg Jones. Id. at 2:17:16 to 2:17:34. Deangelo testified to the existence of a memo in circulation at Ogg Jones in or around 1995, stating the policy of vacation day accruement, and the options of each employee to either a) use the accrued days, b) "carry them over" to the following year, or c) "cash them out" at the end of the year. Id. at 3:07:18 to 3:07:51.

Second, the evidence shows correspondence from Jones to various parties, addressing the issue of vacation time. Judging by the totality of the evidence, it is clear that Jones' opinion corroborates the testimony of the Claimants with regards to the Partnership's obligation to pay cash for unused vacation time. In a signed letter to his attorney, Jones writes that he "specifically spoke" to Terri Michel regarding payment for unused vacation time, and that he "committed the partnership to it." [3]

---

**3.** The Trustee suggests in his trial brief, although does not explicitly claim, that any promise by Jones made in March of 2000 to provide commensurate benefits to the Claimants could *not* have bound the Partnership, as the Partnership was not officially formed until April 8, 2000. By the Trustee's logic, it would seem that the full terms of the agreement would have had to be explicitly reiterated to

the Claimants on the weekend of April 9 in order to bind the Partnership as of April 10, the first day of Claimant's employment. The Trustee is correct in one respect: that the Partnership was not yet bound as of late March, as it was yet to be formed. However, this Court disagrees with the extension of the Trustee's logic to claim that the representations made by Jones in March had no bearing

Movant's Ex. 3 at p. 3. Additionally, Jones writes, "my policy was always that vacation was earned in the prior year. Any departing employee received their unused vacation time for the year in cash, unless . . . fired for willful misconduct." *Id.* Jones, in his previous capacity as managing partner of Ogg Jones, would have been in a good position to know that firm's employment policy.

Finally, we have the testimony of McClain. McClain generally denies the Partnership having any policy to pay cash to employees for unused vacation time. However, it is admitted by McClain that Jones was the managing partner of the Partnership for the time in question. Audio Recording of Hearing Held May 26, 2009 at 3:31:06 to 3:32:19. McClain did not seem to have any responsibilities relating to the hiring or dismissal of personnel, which is corroborated by McClain's inability to recall the circumstances under which most of the other employees of the partnership were hired or dismissed, as well as an inability to properly recall the names of the other employees. *Id.* at 3:41:14 to 3:44:59. McClain, when asked at trial, could not recall if any vacation policy existed whatsoever at the Partnership, nor could he recall any details of a vacation policy from Ogg Jones, where McClain was previously employed as an Associate. *Id.* at 3:38:37 to 3:39:20.

For these reasons, the Court finds that McClain was not in a good position to offer testimony as to what Jones' representations to the Claimants regarding vacation benefits might have been, nor was he in a good position to offer testimony regarding the existence of certain vacation policies at Ogg Jones. Additionally, neither the Trustee, nor McClain represented by counsel, objected to any of the Claimants testimony as hearsay or on any other grounds. As such, the testimony provided by the Claimants, along with admissions of Jones' in his writings, is sufficient to carry the burden of proof as to the existence of a contract to pay cash for unused vacation time. With this threshold issue settled, we turn to the question of how such cash payments should be calculated.

## V.

■ There is some dispute, or perhaps more appropriately characterized as *confusion*, amongst the parties as to the proper formula for accruing vacation time. The Claimants testified that the vacation policy at Ogg Jones—and thus, by way of Jones' promise to the Claimants, at the Partnership—was that vacation time would accrue in full on January 1st of any given year, having been earned over the prior year's employment. This method of accruing vacation time is common in corporate America. By way of example, an employee beginning work in January of 2010 would earn vacation to be used in 2011 throughout their 2010 employment. This vacation time earned in 2010 would thus be available, or accrue, to the employee in full as of January 1, 2011, and could theoretically be used in full during the first month of 2011 if the employee so desired. According to the totality of evidence before the Court, the Claimants have established this to be the policy that was in place at Ogg Jones, and the Trustee does not offer any

on the agreement ultimately reached between the Partnership and the Claimants on April 10. This Court finds that Jones, by accepting their services on April 10, was, in effect, re-extending to the Claimants the same terms that he represented to them in late March, only a few weeks earlier. Indeed, this Court

finds that the Claimants have met their burden with respect to establishing that, on April 10, both Jones and the Claimants were of the understanding that the verbal representations in March would form the basis of the non-written employment agreement entered into on April 10.

evidence to dispute this. It is also established by the testimony of Claimants, and not disputed, that a full year's vacation was set at 15 business days. Additionally, the Claimants assert, and it is not disputed, that Ogg Jones' policy allowed for, among other options, unused days to be carried over from previous years. A letter from Jones to McClain dated July 23, 2001, seems to demonstrate Jones' agreement with the Claimants' assertions. Movant's Ex. 3 at p. 8.

With regards to Claim No. 11 specifically, Michel asserts that she had six (6) vacation days remaining from her 2000 accrued budget, which she alleges she was entitled to carry over to 2001. This brings the total starting balance to 21 days of accrued vacation as of January 1, 2001. Michel then deducts 2 vacation days used in January 2001, to arrive at a net balance of 19 days accrued, but not used, as of her termination in May of 2001.

The Trustee, and McClain, object to the addition of these six (6) carry-over days, *not* because they offer any counter-evidence that would suggest that no carry over policy existed, but rather because they suggest that the six (6) days carried over were "Ogg Jones vacation time" and thus not properly owed to the Claimants by the Partnership. Audio Recording of Hearing Held May 26, 2009 at 2:37:22 to 2:37:32. Indeed, according to the formula explained above, any vacation days that Michel or Deangelo carried over from 2000 would have been earned in 1999, and thus earned while at Ogg Jones. However, this is not reason enough to exclude them.[4]

By way of deduction, the Trustee seems to argue that the employment agreement stipulated that time spent at Ogg Jones could not be used to earn vacation time at the Partnership. If this were the case, the Claimants would have had *zero* earned or accrued vacation time starting on April 10, 2000 (their first day of employment with the Partnership). It is hard to imagine that Jones, in conveying to the Claimants that "everything would stay the same" and that "seniority" would remain, was in fact suggesting that the Claimants would be forfeiting all accrued vacation time even for use in 2000, and thus would need to either forgo any vacation until 2001 or perhaps arrange to borrow against their to-be-accrued vacation on January 1, 2001. It is much more reasonable to assume that the agreement allowed for time spent at Ogg Jones to be used to earn vacation time at the Partnership. This would include time spent in 1999, accrued in 2000 and carried over into 2001 by way of the carry-over policy, as well as time spent in the first three months of 2000, accrued on January 1, 2001.

For these reasons, the 19 days of accrued vacation time, as calculated by Michel—under the direction of Jones—appears to accurately reflect the contracted amount. At her daily rate of $152.30, the total amount due to Michel by the Partnership for accrued, but unused, vacation is $2,893.70. Similarly, the Partnership owes $1,967.30 to Lisa Deangelo pertaining to Claim 12.[5]

---

4. The Court notes that neither the Trustee nor McClain make any particular objection to any of the 15 days earned in 2000, accrued on January 1, 2001, even though the Claimants only worked at the Partnership for 9 months of 2000, and thus could be said to have earned only 75% of those 15 days while working for the Partnership, and the remaining 25% of that time while working for Ogg Jones. For this reason, the Trustee's position with regards to "Ogg Jones vacation time" is, at very least, inconsistent.

5. Lisa Deangelo began 2001 with 15 days accrued (earned in 2000) and 4 days carried over (earned in 1999). She used a total of 3.5 days in January and February of 2001, leaving her with a net balance of 15.5 days upon

## VI.

■ We now turn to the remaining issue: Was the Partnership contractually obligated to pay severance to the Claimants? Or, perhaps more to the point, did Ogg Jones have an established severance policy, which, by way of Jones' agreement with the Claimants, carried over to the Partnership? The best evidence offered on this topic comes in the form of Jones' notes and/or letters to his lawyer, to McClain, and to the Claimants.

In a handwritten memo from Jones' to Deangelo, dated May 17, 2001, Jones' conveys to Deangelo, "I am trying to construct some type of severance package for you and Terri, to make your landing in the 'real world' a little softer." Movant's Ex. 5. Based on this May 17 memo, it appears that Jones had not yet constructed such a severance and thus had not committed the Partnership to it at that time.

The Partnership dissolved on June 22, 2001. In Jones' June 28, 2001 letter to his lawyer, Jones states, with regards to his desire to pay severance to the Claimants, "this is *not* a formal commitment of the partnership" and continues that he "would certainly like to pay something greater than zero." Movant's Ex. 3 at p. 3. Offering further support to the Trustee's case is the July 23, 2001 letter to McClain, where Jones again addresses the topic of severance for the Claimants:

> I believe that [Claimants] are entitled to some form of severance pay. Given the number of years of service ... the figure will not be that small, if traditional formulas are used ... When I left USX, I believe they paid one (1) month for every year of service. Some companies pay much less (one week or a flat rate per year). You probably have access to information concerning what Hartford

paid, if anything. I have made inquiries to other law firms, albeit larger defense firms, and I am waiting for an answer. Of course, I recognize that small personal injury firms probably pay nothing, on average, but I am not sure that this is the standard to aspire to.

Movant's Ex. 3 at pp. 8, 9. It is clear from this correspondence that, as of July 23, Jones still did not believe that a specific obligation to pay severance to the Claimants existed. This is evidenced by the "brainstorming" style of his letter, Jones' consideration of all of the potentially comparable severance policies ' they *might* adopt, and his solicitation of McClain's opinion on the matter.

McClain's testimony corroborates this point. McClain did not believe that any promise had been made that would obligate the Partnership to pay severance to the Claimants. Audio Recording of Hearing Held May 26, 2009 at 3:17:26 to 3:17:40. Additionally, Jones himself had no knowledge of any severance policy that may have existed at Ogg Jones. Movant's Ex. 3 at pp. 8, 9. The Claimants themselves testified that they had no knowledge as to the details of such a policy at Ogg Jones, nor did they have specific knowledge as to the existence of any severance policy at Ogg Jones whatsoever. Audio Recording of Hearing Held May 26, 2009 at 2:52:22 to 2:53:01.

The Claimants' argument also relies, in large part, on certain language contained in the "Policy Statement on Drugs and Alcohol" (the "Policy") which is attached to the Jones & McClain partnership agreement. The Policy, which amounts to a "three strikes and your out" rule, includes provisions for dealing with first-time, second-time and third-time offenders. A sec-

---

her dismissal from the Partnership in May of 2001. At a daily rate of $126.92, the amount

owed to her for unused vacation time totals $1,967.30.

ond violation would require the Partner or employee to attend a mandatory 28–day in-patient program. As the Policy explains, "Failure to comply [with the mandatory 28–day in-patient program requirement] will subject the Partner or employee to automatic discharge. Employees discharged under this provision will receive one-month severance pay and be entitled to collect unemployment benefits." Movant's Ex. 10, Policy at p. 2. The Policy goes on to say, "A third violation of the firm's policy shall result in automatic expulsion ... *Any employee discharged for a third violation will lose all rights to severance pay or unemployment benefits.*" *Id.* at p. 3. (emphasis added).

The Claimants rely on this language to conclude that there must be a general severance policy that exists for employees—otherwise, why would the Policy need to explicitly deny rights to severance pay for a third-time offender? It is clear to this Court, however, that this language was intended to avoid the aforementioned 1–month severance pay afforded to anyone dismissed under the Policy's provisions for a second violation. Indeed, this denial of severance for third-time offenders appears in the paragraph *immediately following* the introduction of the 1–month severance pay for second-time violators. It is not reasonable to assume, based on the language of this Policy, that a general severance policy existed for Partners and employees.

Given the evidence of Jones' beliefs leading up to, and after, the dissolution of the firm, and because no evidence has been offered to carry the burden as to the existence of a severance policy at Ogg Jones, this Court concludes that there was no contract between the Partnership and the Claimants to provide severance pay in the event of dismissal without cause.

### VII.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr.P. 7052. For the reasons set forth above, the Court sustains the Objections in part and denies them in part and finds that:

1. A contract to pay cash for accrued, but unused, vacation time *does* exist between the Partnership and the Claimants. The Partnership is therefore obligated to pay the portions of Claim No. 11 and Claim No. 12 that relate to vacation time, which amounts to $2,893.70 and $1,967.30 respectively.

2. A contract to pay severance *does not* exist between the Partnership and the Claimants. Therefore, the portions of Claim No. 11 and Claim No. 12 that relate to severance are disallowed, which amounts to $26,400.00 and $19,250.00 respectively.